Barbara **PLUMEAU, personally and Amanda Barton–Plumeau by her mother and guardian ad litem, Barbara Plumeau, Plaintiffs,**

v.

**YAMHILL COUNTY SCHOOL DISTRICT # 40 and Adrian Moore, Defendants.**

**No. CV–94–569–ST.**

United States District Court, D. Oregon.

Nov. 14, 1995.

Roger Tilbury, Roch Steinbach, Portland, OR, Kent L. Gubrud, McMinnville, OR, for Plaintiffs.

Robert A. Petersen, Assistant Attorney General, Salem, OR, for Yamhill County, Yamhill County Children's Service Div.

Robert M. Johnstone, Larry A. Brown, Robert M. Johnstone P.C., McMinnville, OR, for Yamhill School Dist. No. 40, City of McMinnville.

## OPINION

STEWART, United States Magistrate Judge:

### INTRODUCTION

Plaintiffs Amanda Barton–Plumeau and her mother, Barbara Plumeau, filed this action under 42 U.S.C. § 1983 against defendants Yamhill County School District # 40 ("the District") and Adrian Moore ("Moore").[1] Plaintiffs' claims arise out of Moore's alleged sexual abuse of Amanda Barton–Plumeau from 1983 to 1987.

In the Amended Complaint, both plaintiffs allege a state tort claim for battery and sexual abuse against both defendants. In addition, as against the District, both plaintiffs allege an additional state tort claim for negligence. Finally, Amanda Barton–Plumeau alleges that the District violated her rights under the Fifth and Fourteenth Amendments to the United States Constitution by failing to protect her from sexual abuse in spite of its knowledge that Moore was sexually abusing schoolgirls ("Third Alternative Cause of Action").

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with F.R.C.P. 73 and 28 U.S.C. § 636(c).

The District has filed a Motion for Judgment on the Pleadings; Motion for Summary Judgment; and Alternative Motion for Summary Judgment (docket # 77) ("District's Motion"). In its motions, the District asks this court to dismiss Barbara Plumeau as a plaintiff for lack of standing and to dismiss or, alternatively, grant summary judgment in its favor on all of plaintiffs' claims. These motions incorporate by reference various documents previously filed in this case. District's Motion, p. 3. For the reasons set forth below, all claims against the District are dismissed.

### UNDISPUTED FACTS

The parties have submitted three separate documents detailing the factual background of this case.[2] The following facts are taken from those documents and the materials supporting them:[3]

At all relevant times, the District operated Memorial Elementary School ("Memorial School") and Adams Elementary School ("Adams School"). Moore is an adult male who, on November 1, 1981, was employed by the District to work as a janitor at Memorial School. Hal Schultz ("Schultz") was the District's Maintenance Supervisor and Moore's direct supervisor.

From 1983 through 1988, Amanda Barton–Plumeau ("Amanda") was enrolled as a student and attended kindergarten through fourth grade (ages 6–9) at Memorial School. Valva D. Just ("Just") was the principal at

---

1. Because Moore filed a Chapter 13 bankruptcy proceeding on January 6, 1995, all proceedings against him are stayed. 11 U.S.C. § 362.

2. Defendant's Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (docket # 27); Plaintiffs' Amended Statement of Material Facts and Issues (docket # 124) ("Plaintiffs' Amended Statement"); and Plaintiffs' Statement of Disputed and Undisputed Facts (docket # 130) ("Plaintiffs' Statement of Facts").

3. While many of these facts are taken from the various affidavits offered by the District, those affidavits do not thoroughly detail the deposition testimony concerning all the observations made by Memorial School employees of Moore watching or interacting with schoolchildren, or the reports of such observations to Just. Therefore, this court has thoroughly reviewed the entire record and will view all such testimony in the light most favorable to plaintiffs.

Memorial School from July 1, 1984 to June 30, 1988.

As early as January 1986, Memorial School employees began reporting to Just that they had observed Moore watching or interacting with schoolchildren at various times. Jean Bresee, who had been an instructional technician at Memorial School since 1980, reported that she saw Moore "on the playground watching children on many different occasions" and that she "observed him watching children from the cafeteria windowed door on many times throughout different days instead of performing his duties." Affidavit of Jean Bresee ("Bresee Aff"), ¶ 4. Bresee does not specify when she first observed Moore watching the children or when she first reported this behavior to Just. However, the first record of such a report is found in Just's notes of January 20, 1986 and indicates that Bresee reported that she had seen Moore in a darkened classroom "peeking out through the curtains at the children on the playground" the previous day. Exhibit 15, p. 2.[4]

The record contains no evidence of any more reports of such behavior to Just for the remainder of the 1985/86 school year. However, on June 9, 1986, Just and Schultz apparently held a conference with Moore to discuss their concerns that Moore was "wasting work time by standing around watching students during lunch and play times." Exhibit 18, p. 3. A police report completed in 1987 indicates that their conferences may have involved "cautioning" Moore not to pick up children. Exhibit 2, p. 8.

At the beginning of the 1986/87 school year, on September 8, 1986, Bresee reported to Just that she had observed Moore standing in the middle of the playground watching children. Bresee Aff, ¶¶ 6-9 and Exhibit 15, p. 3. The following day, Bresee and a teacher's assistant, Jean Meicho ("Meicho"), asked Just to come out on the playground to observe Moore. When Just went out on the playground, Moore came out and watched the children play, but quickly returned to the school building when he saw Just.

Meicho was a teacher's assistant at Memorial School from September 1979 until June 1993. Meicho was responsible for playground duty during recess. At unspecified times, Meicho observed Moore "holding the little girls' hands and hugging them." Affidavit of Jean Delores Meicho ("Meicho Aff"), ¶ 5. Meicho was "not concerned [about this behavior] because [it] was not unusual for any of the school employees that came on the playground." *Id.* Meicho apparently saw Moore standing on the playground watching children on five occasions, hugging children on five occasions, and watching children from a school window on one occasion. While some of these instances may have taken place prior to the fall of 1986, Meicho was not bothered by them as they were not "unusual" and Just had not yet told Memorial School staff to report to her if they saw Moore on the playground. Deposition of Jean Meicho, pp. 24-29, 41, attached as Exhibit 3 to Plaintiffs' Amended Statement.

Meicho became concerned that Moore was "not doing his job" in the fall of 1986 because Moore was spending an increasing amount of time "on the playground standing and watching the children and not performing his job." Meicho Aff, ¶¶ 4, 8. Meicho reported her concerns to Sally Williams ("Mrs. Williams"), then a third-grade teacher at Memorial School, who told Meicho to report her concerns to Just. *Id,* ¶ 8. As described above, Meicho and Bresee then asked Just to come to the playground to observe Moore. At that time, Just apparently told Meicho to report to her if they saw Moore on the playground. Meicho Depo, pp. 28-29.

After the September 8 and 9, 1986 incidents, unnamed teacher's aids reported to Just that Moore came out on the playground on September 10 and 12, 1986. In addition, Bresee reported that on September 12, 1986, she observed Moore standing in the "Pod" area watching children on the playground.

On two separate occasions during the fall of 1986, Mrs. Williams, a teacher, saw Moore pick up children while on the playground. Mrs. Williams testified that she reported these observations to Just, who responded that she "had other reports" and "would take

4. Unless otherwise indicated, all Exhibit references are to those exhibits filed by the District.

care of it." Deposition of Sally Williams, pp. 5–15, attached as Exhibit 5 to Plaintiffs' Amended Statement. However, Just's notes do not reflect these reports from Mrs. Williams.

Just and Schultz held two more conferences with Moore on September 12 and November 10, 1986 to discuss their concerns that Moore was failing to adequately perform his job responsibilities because he was wasting time standing around watching students. Just Aff, ¶ 8; Exhibit 18, p. 3. Moore was told to stay off the playground when children were present and the teachers aides were notified to report to Just if they observed Moore on the playground during the school day. Just Aff, ¶ 7. At the November 10, 1986 conference, Just gave Moore a memorandum which stated:

> Several of the teachers reported to me that you spent almost the entire morning in the gym last Friday watching Miss Dresser and Mr. Autencio teach Jazzercise classes. Since I was out of the building, I did not observe you doing this. I have already discussed with you the matter of your wasting time by standing on the playground during recesses and standing in the cafeteria at lunch time. I don't understand how you can find the time to stand around and watch the children as much as you do. There are many, many jobs that are not being done around the school. Please apply yourself to these things in the future.

Just Aff, ¶ 8 and Plaintiffs' Exhibit 10, attached to Plaintiff's Amended Response to Defendant School District's Second Motion to Dismiss and for Summary Judgment ("Plaintiffs' Amended Response").

Gary Williams ("Mr. Williams") was the principal at Adams School from July 1984 to June 1992. Mr. Williams was concerned about the job performance of the head custodian, Leonard Cushman ("Cushman"). Adams School is a two-story building and Memorial School is only a one-story building. Cushman apparently had knee problems which made it difficult to negotiate the stairs at Adams School. Mr. Williams discussed these concerns with Schultz and discussed with Just the possibility of a job-switch between Moore and Cushman.

Mrs. Williams and/or Just told Mr. Williams that Moore had been observed looking out the window watching children on the playground. In addition, Mr. Williams knew that one of the concerns about Moore's job performance at Memorial School was that Moore was on the playground watching children when he should have been working. However, Mr. Williams denies knowing that anyone had specific concerns about whether Moore's interactions with children were "inappropriate." Affidavit of Gary Keith Williams, ¶ 21.

In November or December 1986, Cushman and Moore were placed on "Plans of Assistance" by District supervisors. Exhibits 16–18. Moore's Plan of Assistance included weekly inspections of his work by Schultz and a request by teachers to evaluate the custodial work done in their classrooms. Exhibit 19.

After November 10, 1986, Just's notes do not contain any further references to Moore watching or interacting with children on the playground or watching children from the school windows. However, Just made notes on January 16 and 21, 1987 that various groups had complained about the cleanliness of the bathrooms and floor of Memorial School's gymnasium. Exhibit 15, pp. 5–6.

On February 2, 1987, Moore was transferred to Adams School and Cushman was transferred to Memorial School. This exchange was purportedly designed to "encourage continued improvement in performance" by Moore and Cushman. Exhibit 19, p. 6.

Upon his transfer, Moore became responsible for Adams School's recycling program. Teachers occasionally sent children to Moore's work area in the boiler room to assist Moore with various tasks such as separating out the recyclables and cleaning erasers.

On the evening of April 13, 1987, the father of an Adams School student called Mr. Williams and complained that Moore had inappropriately touched his daughter. The allegations were immediately reported to Interim Superintendent Murl W. Anderson.

On April 14, 1987, Mr. Williams and the District's Child Development Specialist, Vern Fiske, interviewed the child and several others reportedly inappropriately touched by Moore.

The Children's Services Division ("CSD") and the McMinnville Police Department ("MPD") were informed of the allegations of inappropriate touching. Ms. Erma Vasquez of CSD and Detective Hub Day ("Day") of MPD conducted an investigation of the allegations.

CSD and MPD interviewed possible victims of sexual abuse, as well as Memorial School personnel. Day's report indicates that Just told him that Moore had been cautioned about picking up children in June and September 1986. Exhibit 2, p. 8.

Moore was terminated by the District for gross misconduct on April 14, 1987. Moore was arrested on charges of sexual abuse on April 15, 1987, less than 48 hours after Mr. Williams received the telephone complaint.

Moore was convicted of Sexual Abuse in the First Degree, and Judgment was entered against him in Yamhill County Circuit Court on September 30, 1987. Moore's conviction was published in a newspaper of general circulation in McMinnville, Oregon on September 16, 1987.

In 1987, the District had no specific policy concerning child abuse reporting. However, there was a policy on lodging complaints about school personnel. A child abuse reporting policy was adopted on February 8, 1988. All District personnel were trained to report any allegations or suspicions of child abuse.

Five years later, in May 1992, Amanda was hospitalized after attempting suicide. Shortly after being admitted, Amanda disclosed that she had been sexually abused by Moore between 1984 and 1987.

A criminal investigation of Amanda's claims of sexual abuse ensued. Exhibits 7–9. By the end of July 1992, Barbara Plumeau provided information regarding the alleged sexual abuse of her daughter to CSD, MPD, the Yamhill County District Attorney ("District Attorney"), and/or the Department of Justice ("DOJ"). Affidavit of Barbara Plumeau, pp. 3–4.

Moore was indicted on four counts of First Degree Sexual Abuse of Amanda. Exhibit 10. In July 1993, Moore pleaded guilty to one of those counts. On September 9, 1993, Moore was sentenced to five years probation for that offense, and the remaining three counts were dismissed. Exhibits 12, 13.

Barbara Plumeau was in the courtroom when Moore was sentenced. At that time, an employee of the District Attorney's office advised Barbara Plumeau that she believed Just was responsible for the sexual abuse Moore perpetrated at Memorial School.

This action was then filed on May 20, 1994.

### DISPUTED FACTS

Following oral argument, this court allowed the parties to submit supplemental evidence. Plaintiffs submitted an affidavit from Amanda indicating that, prior to the time she completed first grade, Moore had picked her up, hugged her, and otherwise touched her on numerous occasions. Some time during the 1984–85 school year, she was standing in the lunch line when Moore came into the cafeteria. She ran out of the line to greet him and he picked her up and hugged her. Upon seeing this, her first grade teacher yelled at her to get back into the line. Later that day, Amanda was escorted to Just's office where Just told her that it was inappropriate for Moore to pick her up and that Amanda should not let him do so. Because Just did not ask about it, Amanda did not tell Just about the previous times she had physical contact with Moore. Affidavit of Amanda Barton–Plumeau, pp. 1–2.

Just has no memory of the events described by Amanda. She indicates that it would be out of character for Amanda's teacher to "yell" at Amanda, that she herself would have talked to Moore rather than to Amanda, and that she would have documented any "inappropriate" action in Moore's personnel file as well as reporting such action to the CSD. Second Affidavit of Valva Doree Just, ¶ 3. Furthermore, Just reiterates that she remembers only two occasions when she cautioned Moore about picking up children.

She notified Schultz, as well as Richard Prather, then the District's Personnel Director, about these incidents. *Id.* at ¶ 4. Furthermore, Just flatly denies that anyone ever told, or suggested to her that Moore had "inappropriately" touched, kissed, or hugged students. *Id,* ¶¶ 4, 5. Instead, the only reports she received were from Memorial School employees who were concerned about Moore's poor work performance and propensity to waste time by standing around watching children. *Id,* ¶ 5.

### DISCUSSION

#### I. *Claims Under Oregon's Tort Claims Act*

Plaintiffs' two tort claims against the District for battery and sexual abuse and for negligence are brought under the Oregon Tort Claims Act ("OTCA"), ORS 30.260–.300. Amended Complaint, pp. 3, 7. The District contends that these claims must be dismissed because plaintiffs failed to timely give notice to the District of their claims as required under the OTCA. The District is correct.

The OTCA provides a limited waiver of the state's sovereign immunity and the exclusive remedy for pursuing a tort claim against a public body. ORS 30.300. The District is a "public body" under the meaning of the OTCA. ORS 30.260(4)(b). The OTCA contains the following notice provision:

(1) No action arising from any act or omission of a public body or an officer, employee or agent of a public body ... shall be maintained unless notice of claim is given as required by this section.

(2) Notice of claim shall be given within the following applicable period of time, not including the period, not exceeding 90 days, during which the person injured is unable to give the notice because of the injury or because of minority, incompetency or other incapacity: ...

(b) For all other claims, within 180 days after the alleged loss or injury.

ORS 30.275.

A plaintiff has the burden of establishing that the requisite notice was given. ORS 30.275(7). A plaintiff may satisfy that burden in four ways:

(a) Formal notice of claim as provided in subsections (4) and (5) of this section;

(b) Actual notice of claim as provided in subsection (6) of this section;

(c) Commencement of an action on the claim by or·on behalf of the claimant within the applicable period of time provided in subsection (2) of this section; or

(d) Payment of all or any part of the claim by or on behalf of the public body at any time.

ORS 30.275(3).

■ Under the above provisions, plaintiffs must provide the requisite notice to the District no later than 270 days after the alleged injury (180 days plus 90 days due to Amanda's minority). Plaintiffs argue that they discovered their injuries on one of two alternative dates and gave sufficient "formal" or "actual" notice of their claims within 270 days after those dates.

■ It is undisputed that the only "formal notice" provided to the District under ORS 30.275(5)(b) was by letter dated May 11, 1994 from plaintiffs' attorney to the District's attorney. Exhibit 1. Plaintiffs assert that they first discovered the potential liability of the District on the date of Moore's sentencing, September 9, 1993, when an employee of the District Attorney's office advised Barbara Plumeau that she believed Just was responsible for the sexual abuse Moore perpetrated at Memorial School. Thus, plaintiffs argue that the May 11, 1994 notice of their claims (244 days after September 9, 1993) was sufficient. This argument rests on the premise that even though plaintiffs knew that Moore perpetrated the sexual abuse of Amanda while he was employed by the District as a janitor at Memorial, they did not "discover" their claims against the District until an employee of the District Attorney's office told them whom she blamed. This premise is flawed.

Plaintiffs admit that they "discovered Moore's role" on May 29, 1992, when Amanda first revealed that she had been sexually abused by Moore at Memorial School. Plaintiffs' Amended Response, p. 16. Plaintiffs knew Moore was a janitor at Memorial School when he allegedly perpetrated the

abuse. They knew the alleged abuse took place during school hours and on school property. These facts alone were sufficient to apprise plaintiffs of their potential claims against the District for failure to adequately supervise their employee. Plaintiffs may not have known all the specific facts about the roles of all of the supervisory officials at Memorial School, including the role of Just. However, in the face of obvious facts pointing at a potential for supervisory liability, the OTCA will not permit a plaintiff to sit idly by until some third person divulges his or her personal theory of liability to the plaintiff. The theory or theories espoused by such third persons are irrelevant to the OTCA's notice requirements and may not be used to indefinitely toll a plaintiff's obligation thereunder.

■ Even if they are bound by the May 29, 1992 date, plaintiffs alternatively argue that they gave sufficient notice under the OTCA by advising the District's "investigatory agents" of their claims. The "formal notice" provided to the District on May 11, 1994 was more than 270 days after May 29, 1992. However, plaintiffs claim that they gave "actual notice" to the District by providing all the information they had concerning the case to CSD, the MPD, the District Attorney, and/or the DOJ within two months after May 29, 1992. In other words, plaintiffs argue that notice to these entities was "actual notice" to the District for purposes of the OTCA. This is incorrect.

A plaintiff may satisfy the OTCA's notice requirements by giving the defendant "actual notice" of his or her claim, as provided in ORS 30.275(6). ORS 30.275(3)(b). "Actual notice" is defined as follows:

> Actual notice of claim is any communication by which any individual to whom notice may be given as provided in subsection (5) of this section or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of

the public body. A person responsible for administering tort claims on behalf of a public body is a person who, acting within the scope of the person's responsibility, as an officer, employee or agent of a public body or as an employee or agent of an insurance carrier insuring the public body for risks within the scope of [the OTCA], engages in investigation, negotiation, adjustment or defense of claims within the scope of [the OTCA], or in furnishing or accepting forms for claimants to provide claim information, or in supervising any of those activities.

ORS 30.275(6).

Plaintiffs assert that CSD, the MPD, the District Attorney, and/or the DOJ are the District's "investigatory agents" under ORS 30.275(6), to whom "actual notice" may be given. It is true that the OTCA allows "actual notice" to be given to certain "agents" of the public body. However, only "actual notice" to those agents who are "acting within the scope of [their] responsibility, [on behalf of] a public body ... [and who are] engag[ing] in investigation, negotiation, adjustment or defense of claims within the scope of [the OTCA]" is sufficient. The notice that plaintiffs allegedly provided to CSD, MPD, the District Attorney, and/or the DOJ does not meet this test.

The various entities to which plaintiffs gave notice of Amanda's victimization were indeed "engaged in investigation." However, those entities were engaged in the investigation of potential criminal charges against Moore, not in the investigation of potential tort claims which might be asserted against the District. Those entities were not acting on behalf of the District, and criminal charges are not "within the scope of [the OTCA]." *Id.* Instead, CSD, MPD, the District Attorney, and the DOJ were fulfilling various statutory obligations imposed on them by the State of Oregon to investigate and act upon allegations pointing to criminal misconduct. Plaintiffs argue that the District had "delegated" its investigatory powers to the police, CSD, and the District Attorney's office. Amended Response, pp. 18–19. However, plaintiffs may not rely on notice to state entities who are investigating *criminal*

*charges* to meet their obligations of providing notice to a public body of potential *tort claims.* Because the only adequate notice to the District of plaintiffs' claims (i.e. the May 11, 1994 communication from their attorney) was more than 270 days after the date plaintiffs first discovered their claims, the District is entitled to summary judgment against plaintiffs' tort claims for failure to comply with the notice requirements of the OTCA.

Because this court finds that all of plaintiffs' state tort claims against the District should be dismissed, it need not address the issues of whether Barbara Plumeau lacks standing or whether the District may be held vicariously liable for Moore's intentional torts.

## II. § 1983 Claim

Next, the District contends that it is entitled to summary judgment against the Third Alternative Cause of Action which alleges a claim under 42 U.S.C. § 1983.

42 U.S.C. § 1983, in part, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

■ Thus, to establish a claim under § 1983, a plaintiff must prove both that she was deprived of an existing federal right and that the deprivation occurred under color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988).

■ In this case, Amanda alleges that her Fifth and Fourteenth Amendment rights to due process were violated when she suffered sexual abuse by a District employee during school hours. Because no federal actors are involved, this claim is properly analyzed only under the Fourteenth Amendment: "The Due Process Clause of the Fifth Amendment applies to and restricts only the federal government." *Geneva Towers Ten-*

*ants Org. v. Federated Mortgage Investors,* 504 F.2d 483, 487 (9th Cir.1974), *citing Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952) and *United States v. Davis,* 482 F.2d 893, 897 n. 3 (9th Cir.1973).

### A. *Existing Federal Right*

■ A public school student has a liberty interest in his or her bodily integrity protected by the due process clause of Fourteenth Amendment. The constitutional underpinnings of that right were first recognized by *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) which held that Fourteenth Amendment liberty interests were implicated when school authorities deliberately decided to punish students for misconduct by restraining and paddling them, thereby "inflicting appreciable physical pain." *Id* at 673–74, 97 S.Ct. at 1413–14. Some circuits have extended the liberty interest in *Ingraham* to protect students from sexual abuse. *See Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 450–451 (5th Cir.1994) *cert. denied sub. nom. Lankford v. Doe,* —— U.S. ——, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994) (*"Doe v. Taylor"*); *Black v. Indiana Area Sch. Dist.,* 985 F.2d 707, 709 n. 1 (3rd Cir. 1993); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726–27 (3rd Cir.1989) (*en banc*), *cert denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (*"Stoneking II"*); *Doe v. Paukstat,* 863 F.Supp. 884, 890 (E.D.Wis.1994); *Jane Doe A v. Special Sch. Dist. of St. Louis County,* 682 F.Supp. 451, 457 (E.D.Mo.1988), *aff'd,* 901 F.2d 642 (8th Cir.1990) (*"Doe A"*).

Although the Ninth Circuit has not specifically identified freedom from sexual abuse while attending school to be a recognized liberty interest, it has made a vague reference to the subject. Drawing a contrast between allegations of a right to be free from sexual harassment under Title IX and a right to be free from sexual abuse under the Fourteenth Amendment recognized in *Doe v. Taylor,* the court stated that "the contours of an individual's substantive due process right to bodily integrity were much clearer in 1987 than the Title IX right allegedly violated in this case." *Doe v. Petaluma City Sch. Dist.,*

54 F.3d 1447, 1451 (9th Cir.1995). While not directly adopting the holding in *Doe v. Taylor,* the Ninth Circuit certainly has not indicated any hostility to the concept that a student's liberty interest in bodily integrity includes freedom from sexual abuse.

Despite the lack of direct Ninth Circuit authority, this court believes that a liberty interest in bodily integrity includes freedom from sexual abuse. No meaningful distinction exists between the right to be free from excessive physical violence in the form of corporal punishment and the right to be free from sexual abuse while attending public school. Indeed the fact that some persons consider corporal punishment an acceptable method of discipline has led one court to note that the right to be free from sexual abuse could be said to have been established prior to *Ingraham:* "Since a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice, as some view teacher-inflicted corporal punishment, a student's right to be free from such molestation may be viewed as clearly established even before *Ingraham." Stoneking II,* 882 F.2d at 727 (citations omitted). For these reasons, this court finds that there is (and was at the time of the events alleged in plaintiffs' Amended Complaint) an existing federal right to be free from sexual abuse while attending public school.

**B.** *Under Color of State Law—Policy or Custom*

▮▮▮ After establishing a deprivation of a federally guaranteed right, a plaintiff also must establish that the deprivation took place "under color of [a] statute, ordinance, regulation, custom, or usage, of [a] State" in order to pursue a claim under § 1983. In this case, Amanda alleges that the District may be held liable because the actions of Moore and the inaction of Just were "under color of state law." That allegation is too simplistic. Whether Moore's sexual abuse and/or Just's failure to discover and stop Moore were egregious enough to hold them personally liable under § 1983 is a distinctly different question from whether the District, a local governmental entity, may be held liable under § 1983. The question of wheth-

er the *individual actor(s)* are liable is one step removed from the question of whether the *governmental entity itself* may be held liable.

▮▮▮ A local governmental body cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell v. Department of Social Svcs. of New York City,* 436 U.S. 658, 691–694, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978). In other words, it is not liable solely because it employs a tortfeasor. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id* at 694, 98 S.Ct. at 2037–38. A plaintiff may establish local governmental liability (also commonly referred to as municipal liability) by establishing that: (1) a governmental employee committed the alleged constitutional violation pursuant to a formal governmental policy or a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity"; (2) the individual who committed the constitutional tort was an official with "final policy-making authority" and the challenged action itself thus constituted an act of official governmental policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir.1992), *cert denied,* —— U.S. ——, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993) (citations omitted).

This court will examine each of these three potential bases for liability of the District.

**1.** *Governmental Policy or Custom*

▮▮▮ Governmental liability based on a "policy or custom" may be established in three ways: (1) by governmental policy statements, ordinances, regulations, or decisions officially adopted and promulgated by the body's officers (*Monell* 436 U.S. at 690, 98 S.Ct. at 2035); (2) by governmental practices which, although not authorized by any formally adopted decision, are so permanent and well settled as to constitute a "custom or usage" with the force of law (*id* at 690–91, 98 S.Ct. at 2035–36); or (3) by a failure to train

which amounts to deliberate governmental indifference to the rights of those persons with whom governmental employees come into contact (*City of Canton v. Harris,* 489 U.S. 378, 387–88, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989)).

### a. *Officially Adopted Municipal Policies*

 Amanda does not claim that the District had officially adopted a policy statement, ordinance, regulation, or decision which caused her constitutional injury. In fact, the District did not and could not have an official policy which allowed District employees to perpetrate criminal sexual abuse on minor schoolchildren. The District has no authority to adopt policies which run contrary to state law. Given the state statutes criminalizing sexual contact with minors (ORS 163.427) and the lack of any evidence of an officially-adopted policy authorizing or allowing such behavior, this theory cannot form the basis of District liability.

Nor did the District have a policy which authorized, permitted, or directed its school principals to ignore complaints about other school employees, particularly if there was any suspicion of sexual abuse. To the contrary, state statutes required reporting of suspected child abuse (ORS 418.740–.755) and the District admittedly had one policy in place by 1984 which required any complaint about school personnel to be "referred to the school administration for study and possible solutions." Exhibit 14, p. 6, Policy re: Complaints About School Personnel.

The undisputed evidence concerning actions taken at Memorial and Adams Schools also supports the conclusion that no such District policy existed. Just took *some* action when she began receiving complaints about Moore's work behavior, albeit, according to plaintiffs, the action she took was too little, too late. Furthermore, Just's actions would evidence a District policy of ignoring sexual abuse only if Amanda can show that Just was aware of sexual abuse in the first place. Nothing in the record supports the conclusion that Just had notice of suspected sexual abuse by Moore. Thus, Just's failure to investigate or otherwise react to suspected sexual abuse cannot be used to show evidence of a District policy of ignoring such abuse.

Amanda contends that Just should have suspected sexual abuse based on "inappropriate" interactions between Moore and students as reported by Bresee, Meicho, and Mrs. Williams. However, whether this information should have caused Just to believe that "inappropriate" physical contact was taking place does not relate to whether the District had a policy of ignoring sexual abuse. Rather, it relates to whether the District violated Amanda's constitutional rights by failing to provide more or different training to school personnel about recognizing signs of possible sexual abuse, which is discussed below.

Mr. Williams' actions likewise support the conclusion that the District did not have a policy of ignoring complaints of "inappropriate" physical contacts between District employees and schoolchildren. Faced with a parent's complaint that Moore had "inappropriately" touched a schoolchild, Mr. Williams promptly notified District officials and state authorities including CSD. Rather than evidencing a policy of disregarding such complaints, this evidence indicates that school principals followed a policy of acting swiftly to remedy such complaints.

Finally, neither side has submitted any official District policy authorizing physical contact between school employees and schoolchildren. There is some evidence that it was "not unusual" for there to be some physical contact between such individuals. However, there is no evidence that the District permitted "inappropriate" contacts or contacts of a sexual nature by policy, or even in practice; all the evidence points to the opposite conclusion. Thus, Amanda has failed to show that officially adopted policy statements, ordinances, regulations, or decisions may form the basis of liability in this case.

### b. *Governmental Practices Constituting a "Custom or Usage"*

Governmental liability also may be based on governmental practices which are so permanent and well settled as to constitute a "custom or usage" with the force of law:

Relying on the language of § 1983, the [Supreme] Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988), *quoting Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970).

■ However, Amanda's claim does not appear to rest on an allegation that the District had a practice of allowing or disregarding the sexual abuse of schoolchildren which was so permanent and well settled as to constitute such a custom or usage. There is absolutely no evidence in the record concerning possible sexual abuse of District schoolchildren by anyone other than Moore. Mr. Williams' immediate action upon receiving a complaint of possible "inappropriate" touching of students by Moore is the only indication of what District "practices" were in this regard. Those actions clearly support the conclusion that the District practice, if any, was to act to eliminate such abuse once notified. Thus, Amanda has failed to show a District practice constituting a "custom or usage" and liability based on such a theory is therefore inappropriate.

### c. *Failure to Train Exhibiting Deliberate Indifference*

■ Finally, the District may be liable for a "policy or custom" causing a constitutional deprivation if it failed to train its employees and that that failure constitutes deliberate municipal indifference to the rights of those persons with whom municipal employees come into contact. Amanda appears to rely on this theory to support her claim. Amended Complaint, ¶¶ 40–41.

Although not specifically alleged, Amanda argues that the District may be held responsible for her constitutional injury (*i.e.* the interference with her liberty interest to be free from sexual abuse while attending a public school) due to its deliberate indifference during two distinct time periods: (1)

failing to discover, report, and prevent the sexual abuse from the fall of 1983 until Moore's transfer to Adams School in February 1987; and (2) failing to investigate and identify her as one of Moore's other victims when the sexual abuse at Adams School came to light in April 1987. Amended Complaint, ¶ 30. This court will first address the second of these theories.

### i. *Failure to Investigate After Discovery of the Sexual Abuse*

■ A claim under § 1983 must be supported by an underlying constitutional injury. As discussed above, suffering sexual abuse in a public school may provide the basis for a constitutional claim for deprivation of a liberty interest. Amanda's second theory of recovery rests on Just's conduct following Moore's transfer to Adams School on February 2, 1987. By that time, Moore's sexual abuse of Amanda had ended and she no longer suffered any constitutional injury.

■ Nevertheless, Amanda argues that she suffered more serious psychological trauma than she otherwise would have suffered because the District failed in 1987 to discover that she had been one of Moore's victims at Memorial School. This type of argument clearly addresses the *extent* of Amanda's damages from the underlying constitutional injury, *not* the *existence* of an independent injury. Between Moore's transfer to Adams School and Amanda's suicide attempt five years later, Amanda's liberty interest in being free from sexual abuse by Moore while attending Memorial School was fully protected, i.e. Moore was no longer able to sexually abuse her.

Assuming that a constitutional injury has been inflicted, there is no constitutional mandate that the responsible governmental entity mitigate the damages flowing from that injury. In other words, the District's alleged failure to further investigate in 1987 might be used to show the *extent* of Amanda's damages should she be able to prove that the District is liable for the sexual abuse. However, the failure to further investigate is not an independent claim under § 1983. Thus, to the extent Amanda's § 1983 claim rests on the theory that the District failed to ade-

quately investigate and identify her as a potential victim in 1987 after Moore's transfer, the District is entitled to summary judgment.

### ii. *Failure to Prevent Sexual Abuse between 1983 and 1987*

Amanda's primary theory for holding the District liable under § 1983 is that, with knowledge that Moore was abusing schoolchildren on its premises, the District failed to prevent her from being sexually abused by him.[5] Amanda specifically contends that the District was aware of facts which indicated or should have indicated that Moore was abusing students, and, despite awareness of such facts, the District failed to act to remedy the problem. Thus, the issue is whether the District exhibited deliberate indifference to Amanda's constitutional rights by either (1) failing to train its employees to recognize the signs of sexual abuse or (2) failing to act in the face of facts suggesting possible sexual abuse.

To support this theory of liability, Amanda points to the alleged inaction of Just as the source of her injury. According to Amanda, Just was the District official receiving the reports about Moore's behavior who should have taken further action. Rather than fulfill this supervisory obligation, Just instead adopted a "head in the sand attitude" which resulted in her abuse by Moore. Plaintiffs' Amended Statement, ¶ 27.

■ As a preliminary matter, the District denies that the principals of its schools are responsible for supervising school janitors. It is uncontested that Moore's "direct supervisor" was Schultz, not Just. Just Aff, ¶ 4. Nonetheless, it is evident from the record that Just is the individual to whom District employees were reporting Moore's behavior and Just was clearly involved in advising Moore that his job performance was sub-

standard and to stay away from the playground when children were present. Just attended both conferences with Moore and Schultz; she authored the November 10, 1987 memorandum to Moore; and she was actively involved in implementing the Plan of Action directed at improving Moore's job performance. Conversely, while it is evident that Schultz was also involved in supervising Moore, there is nothing indicating that he ever took action without Just's involvement. This evidence indicates that Just was authorized to act in some form of supervisory capacity over Moore irrespective of whether such supervision was explicitly included in her job description. Thus, it is appropriate to treat Just as Moore's supervisor for purposes of analyzing Amanda's § 1983 claim. Thus, this court will look to Just's actions or inaction and determine whether it evidences "deliberate indifference" so as to impose liability under § 1983.

■ As explained in *Canton*, governmental liability for an alleged failure to train or supervise depends on a showing of (1) a "deliberately indifferent" policy of training or supervision that (2) was the "closely related" cause of the violation of plaintiff's federally protected rights. *Canton* 489 U.S. at 388, 109 S.Ct. at 1204. *See also Davis v. City of Ellensburg,* 869 F.2d 1230, 1235 (9th Cir. 1989) (applying *Canton* standard for failure to train to claim of inadequate supervision).

The fact that a governmental entity can only act through its officers, directors, employees, and agents makes it analytically difficult to separate the concept of *individual liability* from the concept of *governmental liability* and has prompted at least one court to conclude that the same standards of fault and causation must govern:

---

5. Broadly construed, the Amended Complaint could be read to allege claims that the District was deliberately indifferent to Amanda's rights in: (1) hiring and retaining Moore and (2) failing to adequately train Moore. Amended Complaint, ¶ 31(a), (c), and (i) (incorporated into § 1983 allegations under ¶ 37). However, it is clear from the Amended Complaint that the gravamen of the § 1983 claim is that the District, faced with complaints about Moore's behavior at Memorial School, failed to further investigate

and/or supervise Moore. *Id,* ¶ 39. In addition, this is the issue discussed in all the briefing on the pending motion. Thus, this court will analyze the § 1983 claim as one for an alleged failure to investigate and/or supervise Moore after he was hired and an alleged failure to train school personnel to recognize and act upon signs of sexual abuse, rather than one for failure to do a pre-hiring investigation of Moore or to adequately "train" Moore.

The legal elements of an individual's supervisory liability and a political subdivision's liability, however, are similar enough that the same standards of fault and causation should govern. A municipality, with its broad obligation to supervise all of its employees, is liable under § 1983 if it supervises its employee in a manner that manifests deliberate indifference to the constitutional rights of its citizens. We see no principled reason why an individual to whom the municipality has delegated responsibility to directly supervise the employee should not be held liable under the same standard.

*Doe v. Taylor*, 15 F.3d at 453. *See also Greason v. Kemp*, 891 F.2d 829, 837 (11th Cir.1990); *Sample v. Diecks*, 885 F.2d 1099, 1117–18 (3rd Cir.1989).

*Doe v. Taylor* adopted the following test for personal liability of supervisory school officials for a subordinate's sexual abuse of students:

(1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and

(2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and

(3) such failure caused a constitutional injury to the student.

*Doe v. Taylor*, 15 F.3d at 454.

■ The Eighth Circuit has articulated a virtually identical test. *Thelma D. v. Board of Ed.*, 934 F.2d 929, 932–33 (8th Cir.1991). Under this test, Amanda first must show "facts or a pattern of inappropriate sexual behavior by [Moore] pointing plainly toward the conclusion that [he] was sexually abusing [her]."

As early as January 1986, the District knew that Moore spent part of his work day watching children on Memorial School's playground. By mid-September 1986, the District also knew that schoolgirls tended to "hang around" Moore and that Moore sometimes held their hands, hugged them, or picked them up. Miecho Aff, ¶ 5–8; Sally Williams Aff, ¶ 6. In total, the evidence presented in this case indicates that, prior to Moore's transfer to Adams School, Just knew that Moore had: (1) been failing to properly clean the school because he was spending too much time watching students on the playground; (2) on several occasions held the hands of Memorial School students; (3) twice picked up Memorial School students; and (4) hugged students on approximately five occasions.

However, the undisputed evidence also indicates that no District official received a report that Moore had "inappropriately" touched a student until the April 1987 report to Mr. Williams. Nor did any of the Memorial School employees who observed Moore's various interactions with students consider the observations they made "unusual" or "inappropriate."

This court is unwilling to conclude that Moore's watching, holding hands with, picking up, or hugging a student points "plainly toward the conclusion" that he was sexually abusing Amanda or any other student. In hindsight, Moore's actions undoubtedly provide clues as to which students he might have abused at Memorial School, as well as the timing, nature, or extent of the abuse. However, in and of themselves, the reports to Just do not "plainly" point toward sexual abuse. Amanda has submitted nothing, other than her own conclusory statements, that the reports Just received should have alerted her to a need to investigate and remedy ongoing sexual abuse. Absent a specific report of suspected sexual abuse or, at a minimum, a report of "inappropriate" behavior, Just had insufficient information to alert her or the District to the need for a full-blown investigation of possible sexual abuse. Absent such a report, the actual observations made of Moore could just as easily be read to indicate a lazy or slack employee (wasting time by watching students) or the friendly gesture of an authority figure who is regularly around students (talking to them, hugging them, picking them up).

The facts contained in Amanda's post-hearing affidavit do not change this conclusion. That a school employee befriends a school-

child, picks her up and hugs her when she runs over to greet him in full view of the child's teacher is hardly an indicator that something untoward is taking place in the janitor's boiler room.

A full-fledged investigation of possible sexual abuse might have prevented Amanda's victimization. However, the District cannot be held liable for a *constitutional* violation for failing to act on such benign observations, particularly in light of Moore's long-term and apparently unmarred employment history with the District and the obviously slanderous nature of making claims of sexual abuse. These facts might support a common law tort claim that the District "should have known" that Moore was sexually abusing students. However, these observations are not, in and of themselves, sufficient to show that the District's inaction was *constitutionally* deficient. In short, the evidence of what Just (and therefore the District) knew is insufficient to indicate that she or the District were deliberately indifferent to the sexual abuse which everyone now knows was taking place at Memorial School.

The cases which have allowed students to proceed on a theory of deliberate indifference to sexual abuse are clearly distinguishable. In *Doe v. Taylor*, 15 F.3d at 446–56 the entire "school community" knew that teacher had "behaved inappropriately toward a number of young female students over the course of his employment" and supervisory officials had received complaints from parents, as well as from a teacher, who reported witnessing "child molestation." *Stoneking II*, 882 F.2d at 727–31, involved evidence indicating that the principal and assistant principal had received five complaints of sexual assaults of female students by teachers and staff members over four year period. The school district superintendent was told of some of these complaints; the principal kept records of these complaints in secret file at home rather than in the teachers' personnel files; the teachers continued to receive excellent performance evaluations; and the principal and assistant principal intimidated the student from pursuing a complaint by forcing her to publicly recant her allegation. These facts were held sufficient to survive motion for summary judgment, but are lacking in this case.

In addition, several courts have granted summary judgment in cases where the evidence of potential sexual abuse was much stronger than the evidence in this case. Stating that "[h]indsight lends an increased and ominous significance to these prior incidents," the court in *Thelma D*, 934 F.2d at 933, nonetheless granted summary judgment in favor of school board where the board had notice of five prior incidents of sexual abuse lodged against a teacher in the sixteen years preceding the incidents alleged by plaintiffs. *Doe A*, 682 F.Supp. at 455, granted summary judgment where the evidence indicated that officials had received reports that the bus driver was stopping the bus on the side of the road where there were no bus stops and had kissed and/or given a student a "snuggle."

 At most, the evidence in this case indicates that Moore was friendly with Memorial School students and preferred watching or interacting with the students over sweeping the gymnasium or cleaning the bathrooms. This type of evidence does not point "plainly toward the conclusion that [Moore] was sexually abusing [Amanda]" nor does it indicate that Just or the District failed to "take action that was obviously necessary to prevent or stop the abuse." *Doe v. Taylor*, 15 F.3d at 454. Consequently, Amanda has failed to present evidence sufficient to show that the District was deliberately indifferent to the sexual abuse perpetrated on her by Moore and may not rely on this theory to support her § 1983 claim.

## 2. Tort Committed by Official With Final Policy–Making Authority

 In some circumstances, liability against a governmental entity also may be based on actions taken by officials who have final policy-making authority. Whether a particular individual has such policy-making authority is a legal question dependent upon state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989).

Moore clearly had no policy-making authority for the District. Similarly, while Just exercised some supervisory authority over Moore, there is no evidence that she had any authority to set District policies on any subject, and in particular to set policies regarding employee investigation or discipline. Just had no authority to hire or fire janitors and did not in fact hire or fire Moore. Instead, Moore was fired by the District's Superintendent after a hearing before the Superintendent, the District's human resources director, and Mr. Williams. Moore had the right to appeal the decision to the school board as the District's governing unit. Exhibit 21.

■ Furthermore, by failing to take precautions against harm to students, Just was not exercising "policy discretion." "We think that a school principal's failure to take any precautions whatever, if that was unreasonable, is not an exercise of policy discretion, *see Miller v. Grants Pass Irrigation*, 297 Or. 312, 686 P.2d 324 (1984), though a school board's choice between expenditures on security personnel or other types of safeguards might be." *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 22 n. 20, 734 P.2d 1326, 1339 n. 20 (1987).

Finally, as discussed above, even if Moore or Just had some policy-making authority, that authority did not extend a right to implement policies in contravention of state law.

■ For all these reasons, Moore and Just had no final policy-making authority for the District, nor was Just acting as a policy maker when she allegedly failed to investigate and stop Moore from abusing Amanda. Amanda therefore may not base her § 1983 claim against the District on this theory.

### 3. Ratification of Unconstitutional Decision or Action

■ Finally, a plaintiff may base governmental liability on evidence that the unconstitutional tort was ratified by an official with final policy-making authority. In this case, Amanda has offered no such evidence, and the evidence in the record directly refutes such a theory. Because Just had insufficient information to conclude that Moore was abusing Memorial School students, her failure to stop the abuse cannot be considered "ratification" of the abuse. Mr. Williams was the first District employee who obtained sufficient information to conclude that Moore may have interacted "inappropriately" with students. Far from ratifying this behavior, Mr. Williams initiated an investigation which resulted in Moore's immediate termination. There is simply no evidence that any District official ratified Moore's sexual abuse of District students. Therefore, this is not an appropriate basis for District liability for plaintiff's § 1983 claim.

### C. Under Color of State Law—Affirmative Duty to Protect

■ While governmental liability usually is based on a "policy or custom," existing case law also supports liability under a broader theory based on an affirmative duty to protect certain persons. However, in this case, no such affirmative duty exists which will support Amanda's claims against the District.

■ In general, there is "no constitutional duty of state officials to protect members of the public at large from crime." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699–700 (9th Cir.1990) (citations omitted). Thus, "[a]s a general rule, members of the public have no constitutional right to sue state employees who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992), *cert denied*, —— U.S. ——, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). However, two exceptions to this general rule may give rise to an affirmative duty to protect: (1) the "danger creation" exception; and (2) the "special relationship" exception. *Id* at 121.[6]

---

6. This court notes that *Grubbs* discusses these "affirmative duty" exceptions under the heading of "Section 1983 and Third Party Harm." *Grubbs*, 974 F.2d at 120. This court is not aware of a case limiting the use of these exceptions to injuries inflicted by the acts of third parties.

Indeed, the fact that § 1983 claims may include such a wide variety of allegations, including both allegations of a harmful affirmative acts or allegations of a failure to act in the face of an obvious need to act, makes such a limitation difficult to define. However, in a factual situa-

The first exception "involves affirmative conduct on the part of the state in placing the plaintiff in danger" and does not require that the plaintiff be in the "custody" of the state to impose liability. *Id, citing Wood v. Ostrander,* 879 F.2d 583, 588–90 (9th Cir.1989), *cert denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). The second exception recognizes that "[a]fter the state has created a special relationship with a person, as in the case of custody or involuntary hospitalization, cases have imposed liability under a due process theory, premised on abuse of that special relationship." *Id, citing Youngberg v. Romeo,* 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–63, 73 L.Ed.2d 28 (1982) and *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In determining the applicability of these exceptions, a court may consider whether the state was aware of a specific risk of harm to the plaintiff, as well as whether the state affirmatively committed itself to the protection of the plaintiff. *Balistreri,* 901 F.2d at 700.

### 1. *"Danger–Creation" Exception*

In order to proceed on a state-created danger theory of liability, a plaintiff must present evidence that (1) the municipality took affirmative action which increased the risk that plaintiff would be harmed by third persons; and (2) the municipality was sufficiently culpable in failing to protect the plaintiff from the danger. *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 530–31 (5th Cir.1994).

In *Leffall,* the court reviewed other decisions which relied on the state-created danger theory. They include situations where the municipal actors (1) conspired with "skinheads" and sanctioned violence by skinheads against persons demonstrating and burning American flags (*Dwares v. City of New York,* 985 F.2d 94 (2nd Cir.1993); (2) assigned plaintiff to work alone with a known violent sex offender (*Grubbs, supra* note 6)); (3) deserted the plaintiff in a high crime area in the middle of the night after arresting the driver of the car in which she was a passenger (*Wood,* 879 F.2d at 583); (4) arrested a driver and deserted the passengers who were small children (*White v. Rochford,* 592 F.2d 381 (7th Cir.1979)); (5) entrusted a convicted felon with a patrol car which the felon used to pull over a motorist whom he then murdered (*Nishiyama v. Dickson County, Tenn.,* 814 F.2d 277 (6th Cir.1987) (*en banc* )). *Leffall,* 28 F.3d at 530–31.

As demonstrated in these cases, the state-created danger theory applies in situations where the municipal actors either: (1) placed the plaintiff in an area or with persons known to be dangerous; or (2) provided persons known to have violent or abusive proclivities with the means or an increased opportunity to injure the plaintiff. Absent such notice, the municipality does not have the "requisite culpability" to impose liability. *Id,* at 531. In other words, while the state-created danger theory will allow a plaintiff to proceed without evidence of a specific policy or an ongoing custom or practice, a plaintiff must nonetheless present evidence that the municipality was deliberately indifferent to the danger in which it placed the plaintiff.

In this case, there is no evidence that the District was aware of a specific risk of harm to Memorial School students, much less to a particular child such as Amanda. Nor is there any evidence that the District took any affirmative action that created the danger which caused the specific harm suf-

---

tion such as is involved here, use of the theory that the District had an affirmative duty to protect plaintiff from the acts of a District employee, not a third party, would seem inconsistent with *Monell.* In other words, imposing a form of strict liability on the District for its failure to prevent plaintiff's abuse at the hands of a District employee effectively would impose *respondeat superior* liability. At least one court has been faced with the argument that use of an "affirmative duty" theory of liability was "not needed" where the plaintiff was also asserting "custom or policy" liability and the alleged harm was caused by a state actor. However, that court did not decide whether affirmative duty liability was inappropriate in such an instance, but instead noted that defense counsel was not entitled to decide what theories of recovery a plaintiff would pursue. *K.L. v. Southeast Delco Sch. Dist,* 828 F.Supp. 1192, 1196 (E.D.Pa.1993). While this raises an interesting issue related to the applicability of this rule, this court also need not reach the issue because plaintiff has failed to show a sufficiently "special" relationship to impose an affirmative duty on the District to protect her.

fered by Amanda. The District did hire and retain Moore. However, the mere fact that the District employed Moore to perform normal and customary janitorial duties which incidentally gave him access to the entire school building is insufficient to show that the District took affirmative action creating a specific danger to a specific individual. Absent some notice to the District of Moore's propensity to sexually abuse children, Amanda may not rely on this theory.

In other words, the District's innocuous act of hiring and retaining Moore may not form the sole basis for District liability. Instead, Amanda must present some evidence that the District was aware of the specific danger posed by Moore and nonetheless failed to act. As discussed above, Amanda has failed to present evidence that the District had sufficient notice of Moore's "inappropriate" interactions with students to show that the District was "deliberately indifferent" to the need to further investigate and/or supervise Moore. Thus, Amanda may not rely on the state-created danger theory to support her claim.

### 2. "Special Relationship" Exception

Amanda asserts that the District had "custody" of Memorial School students and in turn gave "custody" of those students to Moore. Plaintiffs' Amended Response, pp. 26–27. This assertion raises the issue of whether the District's relationship with students is sufficient to impose on the District an affirmative duty to protect those students from sexual assault by District employees or third parties. This court finds that no such "special relationship" existed.

■ Based on a "special relationship" existing between the state and those persons the state has incarcerated or subjected to involuntary hospitalization, the state must ensure those persons minimal levels of care and protection. *DeShaney v. Winnebago County Dept. of Social Svcs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* social workers and other local officials had received reports that a four-year-old child was being abused by his father, but failed to act to remove the child from the father's home. The father later beat the child into a coma, inflicting severe brain damage and relegating the child to spend the rest of his life institutionalized. The Supreme Court upheld summary judgment on plaintiff's § 1983 claim in favor of defendants. In part, the decision rested on the fact that the state had not taken the child into custody or otherwise restrained his ability to care for himself:

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005–06.

The District asserts that *DeShaney* is controlling because the Court decided in defendants' favor the question of "when, if ever, the failure of a state or local *governmental* entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights." *Id* at 194, 109 S.Ct. at 1002. However, *DeShaney* does not limit the "special relationship" exception to those situations where the state has incarcerated or institutionalized an individual. To the contrary, *DeShaney* expressly declined to give an exhaustive list of which factual situations would merit liability based on an affirmative duty to protect. *Id* at 201 n. 9, 109 S.Ct. at 1006 n. 9; *see also Stoneking II,* 882 F.2d at 724.

■ *DeShaney* clearly does not address the precise issue of whether public schoolchildren have a sufficiently "special" relationship with the local school district so as to impose on the school district an affirmative duty to protect them from sexual abuse while attending school. An affirmative constitutional duty to protect only arises with respect to "particular individuals." *DeShaney,* 489 U.S. at 198, 109 S.Ct. at 1004. Thus far, those "particular individuals" include those persons the state has taken into its custody as prison inmates or involuntarily committed mental patients. *Id* at 200 n. 8, 109 S.Ct. at 1006 n. 8. The defining characteristic is that these are persons the state has, by an affirmative exercise of its power, so restrained that it has "render[ed] [them] unable to care

for [themselves]." *Id* at 200, 109 S.Ct. at 1005.

An argument can be made that public schoolchildren are in state "custody" when attending school, and are there "against [their] will," (*id* at 199–200, 109 S.Ct. at 1005), and that therefore the school district has an affirmative duty to protect them. However, no Circuit has found such a duty. *Stoneking II* sidestepped this issue on remand due to the "uncertainty of the law in this respect" and noted that *DeShaney* precluded the court from relying on "the statutory and common law duties imposed on school officials as the basis of a duty to protect students from harm occurring as a result of a third person." *Stoneking II*, 882 F.2d at 723–24.

Since then, six Circuits have considered the "special relationship" issue in situations involving abuse or neglect of public school students by their classmates or school employees. Five of the six Circuits have expressly determined that no affirmative duty to protect arises, even where the student is attending a residential school. *Jojola v. Chavez*, 55 F.3d 488 (10th Cir.1995) (tenth grade student sexually molested by high school janitor); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir.1995) (*en banc*) (student of residential state high school for the deaf sexually assaulted by classmate); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729 (8th Cir.1993) (mentally retarded public high school student sexually assaulted and raped by classmate); *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364 (3rd Cir.1992), *cert denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) (sixteen and seventeen year old high school students attending vocational-technical school molested by classmates); *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267 (7th Cir.1990) (three middle school students sexually molested by teacher).

A panel of the Eleventh Circuit held that an affirmative duty to protect arose in a situation where an eight-year-old attending a state-operated residential school for the hearing-impaired was sexually assaulted by a thirteen year old classmate. *Spivey v. Elliott*, 29 F.3d 1522 (11th Cir.1994). However,

on *sua sponte* reconsideration, the panel vacated its earlier decision and determined that it need not reach the "affirmative duty" issue because the defendants were entitled to qualified immunity in any event:

> [T]his panel has chosen to withdraw all of its prior opinion which relates to whether the complaint alleges a constitutional right so that the opinion will serve as no precedent on that issue. The opinion is fully reaffirmed, however, on the holding that there was no constitutional duty clearly established at the time of the sexual assault, so the defendant officials were properly entitled to qualified immunity.

*Spivey v. Elliott*, 41 F.3d 1497, 1499 (11th Cir.1995).

■ Contrary to this weight of authority, Amanda contends that the District had the kind of "special relationship" to her envisioned in *DeShaney* because she was required by law to attend public school. However, Oregon law does not require a child to attend public school. Instead, Oregon law imposes on parents the duty to send their child to public school between the ages of 7 and 18 *or:* (1) send their child to a private school; (2) teach their child at home or arrange to have the child taught by a private teacher; or (3) demonstrate to the school board that the child has acquired equivalent knowledge to that acquired in courses taught in grades 1 through 12 in public school. ORS 339.020–.030. In other words, Oregon does not mandate that a child attend a specific school or participate in a specific educational program. Instead, it mandates that, between the time a child is 7 and 18 years of age, efforts be made to ensure that the child reaches a certain educational level or participates in some type of program to attempt to achieve that goal.

■ As explained in *Walton*, the "special relationship" theory of liability necessarily is limited to the narrow range of situations where the state has severely limited the plaintiff's ability to care for him or herself:

> [The "special relationship" exception] only can make constitutional sense—that is holding a government accountable and liable for its official actions—when the state

has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability and opportunity to provide for his own care and safety. It is under such extreme circumstances that the state itself, by its affirmative act and pursuant to its own will, has effectively used its power to force a "special relationship," with respect to which it assumes a certain liability. In short, this "special relationship" does not arise solely because the state exercises custodial control over an individual when a person *voluntarily resides* in a state facility under its custodial rules.

*Walton,* 44 F.3d at 1305 (emphasis in original).

■ Similarly, such a "special relationship" does not arise solely because a parent meets his or her statutory obligations by sending a child to public school. The parent and the child continue to have a wide range of options and the child is not effectively stripped of the ability to care for himself or herself by seeking outside help should a particular condition or event at the school so require. Simply put, the state does not, by making a public school system available to children as one means for a child to attend school or otherwise meet minimal educational requirements, impose a meaningful restraint on the student's liberty. Thus, this court concludes that there is no "special relationship" between a school district and a public school student which gives rise to an affirmative duty on the part of the school district to protect the student from the criminal acts of its employees or third parties.

■ Amanda's assertion that the District gave "custody" of Memorial School students to Moore does not change this conclusion. The nature of the relationship between the District and a student is independent of the issue of permissible contacts between the students and District employees. Moreover, even if this assertion were relevant, nothing in the record indicates that the District gave "custody" of Memorial School students to Moore. While there is some evidence that students were assigned to assist Moore at Adams School, there is nothing indicating that Memorial School students were assigned to assist Moore. Instead, all the evidence indicates that the only possibly authorized contact Moore had with Memorial School students was his limited interactions with them prior to Just's instruction that he not be on the playground when children were present.

### CONCLUSION

The District is entitled to summary judgment against all the tort claims because plaintiffs failed to comply with the notice requirements of the OTCA. In addition, the District is entitled to summary judgment against the § 1983 claim because Amanda has failed to show any legal basis to hold the District liable. Specifically, the evidence is insufficient to show that the District had a "custom or policy" which caused the injuries or that the District created the danger which caused the injuries. Finally, no "special relationship" exists which imposes on the District a constitutional duty to protect students from sexual abuse. Thus, all of plaintiffs' claims against the District are dismissed in accordance with the accompanying Order to Dismiss.