**G.C., an incapacitated person by and through her duly appointed conservator, Kenneth E. COUNTS, Plaintiff,**

v.

**NORTH CLACKAMAS SCHOOL DISTRICT, a political subdivision of the state of Oregon, Ron Naso, Jan Miner, and Angela Tucker, Defendants.**

No. CV 07–686–HU.

United States District Court, D. Oregon.

Aug. 21, 2009.

Peggy S. Foraker, Portland, OR, for Plaintiff.

J. Channing Bennett, Garrett Hemann Robertson P.C., Salem, OR, for Defendants.

## OPINION AND ORDER

MOSMAN, District Judge.

On February 5, 2009, and June 25, 2009, Magistrate Judge Hubel issued Findings and Recommendations ("F & Rs") (## 49, 59) in the above-captioned case recommending that I GRANT defendants' Motion for Partial Summary Judgment (# 24) as to the individual defendants on the Title IX claim, DENY summary judgment as to defendant District on the Title IX claim, and GRANT summary judgment as to the section 1983 claims as to all defendants. Plaintiff (# 65) and defendants (# 60) filed Objections to the F & Rs.

## DISCUSSION

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a *de novo* determination of those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F & R to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003). While the level of scrutiny under which I am required to review the F & R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any of the magistrate judge's F & R. 28 U.S.C. § 636(b)(1)(C).

Upon review, I agree with Judge Hubel's recommendations, and I ADOPT the F & Rs (## 49, 59) as my own opinions.

IT IS SO ORDERED.

## FINDINGS & RECOMMENDATION/ORDER

DENNIS JAMES HUBEL, United States Magistrate Judge.

GC is an incapacitated minor who is represented through her duly appointed conservator Kenneth Counts. She brings this action against the North Clackamas School District ("the District"), District Superintendent Ron Naso, Principal Jan Miner, and special education teacher Angela Tucker.

Plaintiff generally contends that following an alleged sexual assault or rape by a male developmentally disabled student against a female developmentally disabled student in the fall of 2004, the District failed to take adequate measures to prevent an alleged subsequent assault or assaults by the same male developmentally disabled student against plaintiff in the spring of 2005. Specifically, plaintiff brings a claim of negligence against the District, a claim under Title IX against the District and all three individual defendants, and a claim under 42 U.S.C. § 1983 against the District, Naso, and Miner.

Defendants move for summary judgment against the Title IX and section 1983 claims. The motion does not address the negligence claim. Defendants also move to strike several paragraphs of Counts's Declaration.

I recommend that defendants' motion be granted in part and denied in part. I deny the motion to strike as moot.

## BACKGROUND

Plaintiff is developmentally disabled, has a low IQ, and suffers from behavioral issues. In the 2004–05 school year, she was a student at Clackamas High School, and pursuant to her individualized education plan (IEP), she was placed primarily in the "life skills class" taught by Tucker and four instructional assistants. The life skills class was also the primary program for developmentally disabled students KW and AY.

AY is mentally disabled and autistic. KW, AY, and plaintiff had a history of flirting in violation of the life skills class rules. There may have been a history of kissing between KW and AY.

Sometime between October 12, 2004, and October 15, 2004, KW's mother contacted the school to report a sexual incident between KW and AY, which was alleged to have occurred on October 11, 2004. The mother spoke to Tucker by phone and reported that KW had been inappropriately touched by AY. She reported that the incident occurred "during recycling." Assistant Principal Mark Pinder states that KW's mother reported that some kind of sexual contact occurred. He does not recall if KW's mother used the term rape.

The police conducted an investigation into the allegations made by KW's mother. The police informed the District that they were unable to determine what, if anything, had occurred. The police concluded that even if KW and AY had engaged in sex, AY could not form the criminal intent necessary to be charged with a crime.

The District also investigated the allegations and was unable to substantiate them. Pinder states that the investigation was exhaustive and included interviews of both families and students, and also involved District Risk Manager Gary Richter. Pinder found no evidence that AY had engaged in any kind of sexual touching or contact with KW or any other girl. The District found no evidence that the incident had occurred.

In addition to Pinder's testimony, Richter stated that he interviewed every single staff member who could have had any possible knowledge of the incident, he looked at the time frame, and the general circumstances, and nothing fit. The District concluded that this "KW event" did not take place.

Tucker stated that she was concerned that KW was not a credible reporter because she did not tell the truth. She also noted that although at some point Pinder had mentioned rape, KW's mother had said something different to Tucker. To Tucker, this showed an inconsistency because "[i]t went from one level to the next level." Tucker Depo. at p. 41. She admits that she did not consider that KW's mother had talked further with KW. At some point, Tucker concluded that KW was lying. Id. at p. 49. Miner personally "believed [KW] was not telling a factual truth[.]" Miner Depo. at p. 4.

Plaintiff was one alleged witness to the KW incident. At the time of her initial interview with Miner and Pinder, she stated that she saw a boy leaving the bathroom while KW was buttoning her blouse. Miner Depo. at pp. 9–10. Later, plaintiff stated that the boy was AY. Richter Depo. at p. 56. The District agrees that during its investigation, it learned that plaintiff contended that she saw KW buttoning her

blouse and crying, and that the boy she saw leaving the bathroom was AY.

Even though the District could not substantiate the KW allegation against AY, it explored the possibility of removing AY from the program. School psychologist Cynthia Panko explained that "after KW," there was a discussion of how to "move forward" with both students. Panko Depo. at pp. 24–25. One option was to split the students and move them to different schools. *Id.* Panko met with AY's foster mother and case worker to explore moving him to another school within the District. *Id.* The case worker expressed concern about moving a student to a more restrictive environment. *Id.* at p. 25. Panko explained that without "collaborating evidence" of what "had happened," the District did not have an option to move AY to a more restrictive environment. *Id.* According to Panko, while a parent may opt for this, it cannot be done at the District's insistence absent more evidence that the incident occurred. *See id.*[1]

The District performed functional behavioral assessments of KW, AY, and plaintiff. In a document entitled "Functional Behavioral Assessment Behavior Support Plan (F–BSP) Protocol," dated October 19, 2004, Panko noted, in a section apparently recording information obtained from an interview with a teacher, staff, or parent, that AY thinks he has a girlfriend with whom he hugs and kisses, believing it to be appropriate. Pltf's Exh. 19 at p. 1. Panko noted that in an unstructured setting, the likelihood of sexual advances by AY with his girlfriend, was a "3" or a "4" on a low to high scale of 1 to 6. *Id.*

In the actual Functional Behavioral Assessment, Panko noted, in a section for "Triggering Antecedents," that AY believed that KW was his girlfriend and that he is likely to engage in flirtatious or sexual behavior in the presence of girls he finds attractive and when he has less supervision, such as "passing time," riding the school bus, and during unstructured times. Pltf's Exh. 6. Panko further stated that AY could benefit from instruction on the difference between a friend and a girlfriend, and the difference between appropriate sexual behavior for his age and development and inappropriate sexual behavior. *Id.*

The District did offer KW the opportunity to change schools. Pltf's Exh. 22. KW did not return to Tucker's classroom. Apparently, at some point, the family moved out of the District.

The District developed a plan to place AY under a high level of supervision which mandated that he would be under "line of sight" supervision at all times. Richter testified that after the information was presented to the District about KW's allegations, it immediately put AY on "very constant supervision." Richter Depo. at p. 37. Even before the supervision plan was adopted, Tucker had instructed her class that any kind of touching was inappropriate in her class. Tucker Depo. at p. 50. In her classroom, there was no hand holding, no hugging, no "side" hugging, no kissing, and no calling each other pet names. *Id.* at p. 51.

Tucker testified that the plan adopted for AY in light of the KW event required that AY be with a paid adult, staff member from the time he arrived at school until the time he left. Tucker Depo. at p. 55. Thus, for example, while before October

---

1. While the District may have felt constrained from removing AY from the school or the District, it does not appear to dispute that it had the ability to suspend AY for up to ten days to the same extent, and with the same notice, as for students without disabilities. Pltf's Exh. 26. Such a suspension is not considered a change in a disabled student's placement. *Id.*

2004, AY had been allowed to go to the bathroom unaccompanied, now, if he needed to use the bathroom while in Tucker's classroom, one of the staff or Tucker herself took him there. *Id.* According to Tucker, there was never an opportunity for AY to be outside the presence of a supervisor. *Id.*; *see also* Sharmon Martin Depo. at p. 17 (no opportunity for AY to be unescorted outside the classroom; Martin unaware of any instance when AY was not escorted); Bibana Ries–Clarke Depo. at p. 20 (no time when student went to bathroom without having an adult with them).

Pinder testified that he and the rest of the administration determined that AY should be supervised after this event with KW. Pinder Depo. at p. 42. The supervision was to be provided by Tucker's staff. *Id.* The protocol established for AY was to provide supervision so that he was never alone on school property. *Id.* at p. 43. Pinder never became concerned that there were insufficient resources to meet that protocol. *Id.*

After the "KW event" and while in the life skills class, AY and plaintiff were placed in separate groups and instructed not to talk to each other. Panko met with AY, together with his foster mother and case worker, and instructed him about appropriate conduct with the opposite sex. Panko instructed AY about appropriate school behavior, including that it was inappropriate to kiss, hug, or touch others. Panko. Depo. at pp. 20–21.

Plaintiff denies defendants' assertion that the District immediately implemented the supervision plan and denies that from that point forward, AY was escorted by a paid staff member at all times while at school. In support of her denial, plaintiff cites to paragraphs six, seven, and nine of Counts's Declaration. The testimony offered there, however, does not create a dispute about defendants' assertions regarding the supervision plan for AY and his actual supervision while at school. The statements in paragraphs six and seven of Counts's Declaration relate only to an alleged incident in the spring of 2005 that allegedly occurred on a bus. There is no statement in these paragraphs regarding supervision of AY, or the lack thereof, while on the school property itself.

In paragraph nine, Counts refers to an alleged bus incident involving KW in 2004, and criticizes the District's failure to believe either KW or plaintiff in regard to the KW event in the fall of 2004. Nothing in paragraph nine refutes defendants' assertion that following KW's allegations, the District immediately implemented a line of sight supervision and escort plan for AY. Thus, distinguishing between the line of sight supervision/escort plans implemented for AY while on school property, and the transportation plan, discussed below, plaintiff fails to create a disputed issue of fact regarding defendants' creation of and immediate implementation of a line of sight/escort plan for AY while on school property.[2]

In their Concise Statement of Facts (CSF), defendants assert that the District implemented a rule by which AY and plaintiff would not be transported on the same bus. Defts' CSF at ¶ 22. Defendants further assert that AY and plaintiff were escorted to and from school on separate buses and they did not use the same special education transports during the school day. *Id.* at ¶ 23.

---

**2.** While there may be no dispute about the District's creation and immediate implementation of a line of sight/escort plan for AY while on school property, there are questions of fact regarding the adequacy of the performance of that plan as the school year continued, as demonstrated by plaintiff's allegation, discussed below, that AY assaulted her while on school property in June 2005.

Although plaintiff apparently agrees that following the "KW event," AY and plaintiff were transported to and from school on different buses, plaintiff disputes the assertion that AY and plaintiff were separately transported during the school day for special education transports. Pltf's Resp. to Defts' Am. & Sec. Am. Stmt. of Facts at ¶ 23 ("Plaintiff admits GC rode to school from home and back on a different bus from AY and denies that GC and AY were on separate buses for transportation to school programs during the day and affirmatively state[s] they rode on the same small bus during the day to and from school for those programs.").

The evidence in the record is unclear. Defendants cite to the following evidence in support of their assertions: (1) Tucker Deposition at p. 70, lines 1–5; p. 103, lines 16–22; (2) Richter Deposition at p. 83, lines 3–21; (3) Ketterman Deposition at p. 35, line 18—p. 36, line 10; and (4) District bus records. Defts' CSF at ¶¶ 22, 23.

Tucker states that she does not recall that "they" rode on the same bus together. Tucker Depo. at p. 70. She thought that GC rode a regular education bus and that AY rode "special education." *Id.* While her reference to "GC" suggests that her prior reference to "they," is likely GC and AY, she does not expressly state who "they" refers to. Her testimony also does not discuss what time period she refers to, or whether she refers to the bus to and from school, or to the separate special education bus or buses during the school day.

Next, Tucker states that she did not recall whether KW and AY came and went to school in the mornings and evenings on the same bus. *Id.* at p. 103. She recalled that at one time they did ride together, but that the District made different seating arrangements for them because of an issue on the bus. *Id.* The problem with this testimony is that it refers to AY and KW, but the asserted fact is about AY and plaintiff.

Richter testified that "they" made arrangements for KW and AY to ride on different buses, but again, that is not supportive of the asserted fact which addresses buses for AY and plaintiff. Richter Depo. at p. 83. He also states that at the time of the initial investigation into the KW event, before he got involved, "they" had already made arrangements to remove plaintiff to a different placement on the bus. *Id.* This is unclear as to whether plaintiff sat in a different seat on the same bus, or actually took a separate bus. It also does not make clear which bus or buses Richter refers to.

Jennifer Ketterman, whom I believe is an instructional aide in Tucker's class, states that after KW made her allegations against AY, they did not have "them" sitting next to each other on a bus, but kept them completely separated. Ketterman Depo. at p. 36. Again, this appears to refer to KW and AY, not AY and plaintiff.

In addition to the cited deposition testimony, defendants submit approximately twenty pages of bus schedules and records with no explanation of how to decipher them. It is apparent that some of them have to do with KW, which again, does not support the asserted fact which concerns AY and plaintiff. *E.g.,* Deft's Exh. 22 at pp. 14–15. From what I can gather, it looks like AY started the year riding a bus that took him to and from the high school each day. Defts' Exh. 22 at p. 16. On October 18, 2004, this was changed so that he was picked up at home and taken to the high school, then picked up from the high school at 1:50 p.m. and taken to the skills center. *Id.* at p. 17. He was then picked up from the skills center at 3:00 pm and taken home. *Id.* A November 2, 2004 update to his schedule states that he is not to have contact with or ride the bus with KW. *Id.* at p. 19.

There are several pages of certain bus route schedules for AY, a couple of which also bear KW's initials. *Id.* at pp. 20–24. They are dated June 9, 2005, and make no mention of plaintiff. *Id.* Two more pages of route schedules for AY are dated September 25, 2008, and make no mention of plaintiff. *Id.* at pp. 29–30. There are two pages of what appears to be AY's class schedule when he was in eleventh grade. *Id.* at p. 25. Those pages are undated. *Id.* There is also a 2004–2005 school calendar and bell schedule. *Id.* at pp. 27–28. None of these documents supports the assertion that following KW's allegations against AY, defendants placed plaintiff and AY on separate buses, both to and from school as well as during the school day.

Then, there are four pages entitled "Student List." *Id.* at pp. 31–34. Three of the pages are "Student List 04–05" and one is "Student List 05–06." *Id.*[3] These are typewritten with several columns full of entries, only some of which are self-explanatory. *Id.* Some appear to be phone numbers and dates (ranging from 1986 to 2004). *Id.* Other columns appear to be locations and times, days of the week, and possibly, bus route numbers. *Id.*

Handwritten (with no indication of authorship), next to several lines of entries are the initials of plaintiff, AY, and KW. *Id.* Presumably, then, these records are intended to reveal something about the buses these students took, as well as when and to where. One apparent problem is that the "Student List 05–06" shows information only for plaintiff, and, as I understand the record, only for the 2005–2006

school year which is months after the fall 2004 KW allegation against AY and thus, months after defendants assert they began separating plaintiff and AY on the buses. Another readily apparent problem is that the pages entitled "Student List 04–05" appear to contain information only about AY and KW and thus, fail to show what, if anything, the district did regarding bus routes for plaintiff and AY in the wake of KW's allegations against AY.

Additionally, there is the lack of any explanation of what these records show. At oral argument, I told defense counsel that without some interpretation, the information in these documents was not probative of defendants' assertion. Defendants agreed to submit an unredacted copy of the bus records, under seal, which they did on December 4, 2008. These records, while now containing the full names of AY, KW, and plaintiff, still, absent additional explanation, fail to establish defendants' assertion that following the KW allegations, plaintiff and AY were separated on all District buses.

In the spring of 2005, plaintiff alleged that AY had exposed himself to her on the bus and had shown her his "sperms," which Pinder understood to mean that plaintiff contended that AY had ejaculated in front of her. Pinder Depo. at pp. 56–59. Pinder testified in deposition that he immediately conducted an investigation and found no corroborating evidence that the incident had occurred. *Id.* at p. 56.

After the end of the 2004–05 school year, the District learned that plaintiff was alleging that she had a sexual encounter with AY on June 7, 2005.[4] Richter states

---

3. As best I can tell, page 32 is identical to page 34, at least as far as the entries for AY are concerned.

4. In her CSF, plaintiff asserts that on the last Tuesday of the school year, AY pulled plaintiff into the boys' bathroom and raped her. Pltf's CSF at ¶ 34. In support, plaintiff cites

to pages 8–9 of her deposition. On those pages, however, she explains that "Bib" told her to go upstairs to get barrels for the pop cans to bring back downstairs so they could sort the cans. Pltf's Depo. at p. 8. She testified that AY snuck behind the teacher's back and "that's how it happened." *Id.* She states she was outside in the back sorting pop cans

that he received a call in July 2005 from an investigating officer about an alleged incident. Richter Depo. at p. 19. The police investigated the allegations. The detective's report states that as of August 1, 2005, the detective had contacted all the parties involved in the investigation and that plaintiff and her mother did not wish to pursue criminal charges against AY. Defts' Exh. 28 at p. 4. The detective reported further that it did not appear that plaintiff or AY had the mental capacity to be charged with a crime. *Id.* Of course the mental capacity issue has nothing to do with whether the incident occurred.

Defendants assert that they performed an investigation and were unable to substantiate the allegation. Defts' CSF at ¶ 31. Defendants' cited evidence does not support this assertion. In support, defendants cite to Miner's deposition. In the page defendants provide and the lines underlined, Miner states her opinion that it was highly improbable that something happened in the bathroom between KW and AY. Miner Depo. at p. 40. This testimony makes no reference to an investigation of anything or what facts were discovered, much less to the allegations by plaintiff against AY concerning a June 2005 sexual encounter. Thus, without more, there is no support for this assertion by defendants that it conducted its own investigation of plaintiff's allegation and could not substantiate it.

The District again reviewed its supervision plan and confirmed that AY remained under a high level of supervision. *See* Tucker Depo. at p. 71 (after the allegation by GC (it is unclear which allegation she refers to, the alleged ejaculation on the bus or the alleged sexual encounter/rape of

June 2005), the level of supervision of AY did not change because he was already under a high level of supervision); Pinder Depo. at pp. 50–51 (District continued to highly supervise AY after plaintiff made her allegations); Miner Depo. at p. 40 (Miner understood that after plaintiff's allegations, AY continued to have constant supervision).

Plaintiff graduated from Clackamas High School in June 2005, and moved into the District's community transition program at another facility. AY did not graduate and remained in the life skills class instead of joining plaintiff in the community transition program. GC's parents did not object to this plan.

In February 2006, during the 2005–06 school year, the District petitioned Clackamas County Circuit Court Judge Deanne Darling, the appointed judge handling AY's foster care, and asked that AY be sent to a new district. The letter to Judge Darling, written by Panko, notes that the District had recently learned that AY had been moved out of his foster home due to concerns about sexual behavior with a younger child living in the home. Defts' Exh. 36. AY was moved to a group home. *Id.* The letter also mentions that there were "serious allegations" made against AY the previous year and that by moving AY to a different district, he would not be placed in the same adult community transition program as one of the persons who had made one of the allegations against him. *Id.* Judge Darling denied the District's request and entered a court order mandating that AY remain in the District.

The parties agree that since the alleged incident at the end of the 2004–05 school

and AY snuck out. *Id.* at p. 9. The cited pages do not support an allegation that plaintiff testified that AY pulled her into the boys' bathroom and raped her there. On my own reading of other, uncited pages in plaintiff's

deposition, I found a different page where she says that "AY took my pants down and raped me in the boys bathroom." Pltf's Depo. at p. 6.

year, plaintiff has remained in the District. Defendants contend that neither plaintiff's instructors nor her aides report having observed any behavioral or educational decline while plaintiff has been in the community transition program. Plaintiff disputes this assertion. I discuss it further below.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.' " *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991) (quoting *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Id.; In re Agricultural Research and Tech. Group,* 916 F.2d 528, 534 (9th Cir.1990); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987).

## DISCUSSION

### I. Title IX Claims

As noted above, plaintiff brings claims against the District and the three individual defendants under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688. The operative part of the statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance, . . . ." 20 U.S.C. § 1681(a).

### A. Claim Against Individual Defendants

■ Defendants contend that plaintiff cannot maintain a Title IX claim against the individual defendants Naso, Miner, and Tucker, because only recipients of federal funding can be held liable for Title IX violations. I agree.

In 1999, the Supreme Court held that

[t]he government's enforcement power may only be exercised against the funding recipient, . . ., and we have not ex-

tended damages liability under Title IX to parties outside the scope of this power.

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640–41, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

Courts have "consistently held that Title IX does not subject school officials to liability in their individual capacities." *Sherez v. State of Haw. Dep't of Educ.*, 396 F.Supp.2d 1138, 1145 (D.Haw.2005) (citing *inter alia, Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir.1999); *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607 (8th Cir. 1999); *Smith v. Metropolitan Sch. Dist. Perry Township*, 128 F.3d 1014, 1019 (7th Cir.1997); *Lipsett v. University of P.R.*, 864 F.2d 881, 901 (1st Cir.1988)); *see also, e.g., Williams v. Board of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1299–1300 (11th Cir.2007) (Title IX does not allow claims against individual school officials); *Miotto v. Yonkers Pub. Sch.*, 534 F.Supp.2d 422, 426 (S.D.N.Y.2008) (citing eight other district court cases in the Second Circuit holding that there is no individual liability under Title IX); *Norris v. Norwalk Pub. Sch.*, 124 F.Supp.2d 791, 795–98 (D.Conn.2000) (same); *Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1576 (N.D.Cal.1993) (individuals may not be held personally liable under Title IX; instead, educational institution must be sued), *motion for reconsideration granted on other grounds*, 949 F.Supp. 1415 (N.D.Cal.1996).

On the basis of this overwhelming authority, I conclude that if the Ninth Circuit were presented with the issue, it would hold that individuals are not subject to liability under Title IX. I recommend that summary judgment be granted to the individual defendants on the Title IX claim.

### B. Claim Against the District

■ The *Davis* case established four requirements for imposing Title IX liability upon a federally funded school for student-to-student harassment. First, the school must exercise "substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645, 119 S.Ct. 1661. Second, the sexual harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650, 119 S.Ct. 1661. Third, the school must have had "actual knowledge" of the harassment. *Id.* Fourth, the school district is liable only if its "deliberate indifference subjects its students to harassment." *Id.* at 644, 119 S.Ct. 1661.

Here, defendants contend that plaintiff's Title IX claim must be dismissed because the District was not deliberately indifferent and because plaintiff did not suffer a loss of educational opportunity. I address the arguments in turn.

#### 1. Deliberate Indifference

■ In holding that deliberate indifference to known acts of harassment may amount to an intentional violation of Title IX, capable of supporting a private damages action in the context of student-to-student harassment, the Supreme Court made clear that school districts were not required to "purge" their schools of "actionable peer harassment" or "engage in particular disciplinary action." *Id.* at 648, 119 S.Ct. 1661. The Court rejected the argument that "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." *Id.* (internal quotation omitted).

The Court reasserted that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* Liability will be found "only where the [school's] response to the harassment or lack thereof is clearly un-

reasonable in light of the known circumstances." *Id.* That is, the school "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.*

Defendants contend that as a matter of law, the District was not deliberately indifferent. In their reply memorandum, and at oral argument, defendants stressed that plaintiff did not dispute that the District took several steps in responding to KW's allegation against AY. Defendants argue that considering only these undisputed facts, no reasonable juror could conclude that the District's response was clearly unreasonable. While I acknowledge that the deliberate indifference standard is wholly separate from and more stringent than a negligence standard, I conclude that when all inferences are drawn in plaintiff's favor, reasonable jurors could differ on whether the District was deliberately indifferent and thus, I recommend that this part of the motion be denied.

Defendants rely on the following undisputed facts:

(1) the District cooperated with the police and undertook its own investigation of KW's allegations against AY;

(2) the District explored the possibility of moving AY from the school;

(3) the District performed functional behavioral assessments on AY, KW, and plaintiff;

(4) the District created a plan to place AY on high level line-of-sight supervision, under which he would never be left unsupervised;

(5) the District instructed AY and plaintiff not to talk about KW's allegations with each other and separated them while at school; and

(6) the District modified AY's IEP to include training on appropriate interaction with females.

Clearly, these facts show that the District did not completely fail to act in response to KW's allegations against AY. This is not a case where a district ignored a situation or refused to implement some corrective measures. However, these undisputed facts do not recite the complete story and it is when all of the facts disclosed in the record are considered that issues of fact, or inferences from facts, raise concerns about (1) what the District knew, (2) the thoroughness of its investigation of the KW event, and thus, (3) its response to that event.

The record discloses that several years before the KW event, the District had reason to review all of its "activities regarding any forms or, or reports on child abuse." Pltf's Exh. 4. The District embarked on developing a training program for administrators and key school personnel, including "the initial interview, how to proceed after a complaint, physical and logistical issues, and personnel follow-up." *Id.*

While the record does not contain information on what training program the District eventually created, or whether frontline teachers were considered "key school personnel," both Tucker and Miner testified that neither had received any training by the District on how to address allegations of sexual abuse by a student. Tucker Depo. at p. 23; Miner Depo. at p. 25.

The lack of training by itself does not establish deliberate indifference to plaintiff's rights. Notably, the incident precipitating the District's decision to review its child abuse reporting and investigation procedures pre-dates the KW event by more than three years.

But, the District's failure to ensure that its principal, and its teachers, received training in handling reports of sex abuse, could be viewed by a reasonable juror as evidence that the District does not take

such allegations with the seriousness such allegations deserve. To be sure, this is not the only inference to be drawn. It is only one of many. But, on summary judgment, when I am required to draw all reasonable inferences in plaintiff's favor, I find that here, the District's child abuse reporting and investigation training policies, or lack thereof, are relevant in assessing how the District handled KW's allegation against AY.

As to the KW event, it is, as defendants represent, undisputed that the District conducted an investigation and could not substantiate KW's allegations. While there is no challenge to the fact that defendants concluded that the KW event, as alleged, did not occur, other evidence in the record indicates that the police investigation was inconclusive and that at a minimum, the District was put on notice that it had potential problems with supervision.

In a November 15, 2004 "memo to file" by Richter, he memorializes a "lengthy conversation" he had with a detective who worked on the KW case. Pltf's Exh. 16. Although the police were closing the matter, Richter writes in the memo that the detective indicated that "[the detective] found enough problems with how this is represented to have taken place to believe that it was possible that it could have occurred." *Id.* The detective did not tell Richter that it definitely had occurred, "only that there were some circumstances that made this more likely." *Id.* The detective also "confirm[ed]" for Richter that "insufficient supervision on the part of our staff was clearly an issue that might have allowed this to have occurred." *Id.* The detective was "not convinced that anything had occurred, but did believe that there may have been some inappropriate touching involved between the two youths." *Id.*

■ Defendants object to plaintiff's reliance on this document as being hearsay, conclusory, and lacking factual or eviden-

tiary support. I do not find the document to be hearsay because it is relied on not to prove the truth of the matter asserted (that the KW incident occurred or that there was indeed insufficient supervision), but rather, to show that the District was on notice that the official law enforcement agency in charge of the investigation of the incident could not reach a conclusion and thought that lack of supervision could have contributed to the incident. Accordingly, the document is admissible evidence.

Construing the inferences created by this evidence in plaintiff's favor, a reasonable juror could surmise that comparing the police investigation with the District's, the District's investigation was flawed in some regard and thus, it failed to reveal a problem more serious than the District thought it had. Again, this is not the only inference created by the document. But, this inference counsels against granting summary judgment to defendants.

Additionally, while the District concluded that the KW event did not happen, it was on notice that AY had, at some point a few years earlier, received services from a "behavior consultant" who regularly came into AY's home due to a sister's report that AY was "sexually curious." Pltf's Exh. 28. This report is contained in an August 31, 2001 document generated by David Douglas School District. *Id.*

Defendants do not deny that this report was contained in plaintiff's file with the District. It is also undisputed that Panko, in completing AY's functional behavior assessment following KW's allegations in the fall of 2004, did not seek out more information from David Douglas on this issue. Panko Depo. at pp. 7–8. Tucker also had no other information about the "sexually curious" statement in the report, and she could not recall if she asked for additional information about it. Tucker Depo. at pp. 15–16.

This is another piece of evidence which a reasonable juror could rely on in determining that once the District had knowledge of KW's allegations, had knowledge that the police report was inconclusive, and had knowledge that the police thought the District's supervision of the students involved was possibly insufficient, the District's response to that knowledge should have included some additional investigation into AY's previous report of being "sexually curious." As noted above, the deliberate indifference standard is a high one and the District's actions are not to be examined in hindsight. Nonetheless, with this evidence in the record, I cannot say no reasonable juror could conclude that the District's response to the KW event was clearly unreasonable.

Not only did the District possess some knowledge of AY's previous sexual curiosity, the District was also on notice that some type of inappropriate touching had occurred among AY, KW, and possibly, plaintiff, in the spring of 2004 while riding the bus. The record is a bit unclear, but Pinder's November 1, 2004 notes of a meeting attended by Pinder, Tucker, AY's foster mother, AY's case worker, and one other individual, refer to "[i]nappropriate touching on bus last year." *Id.*

Richter testified that in the past, "other issues" had taken place between AY and girls on the bus because the "girls were making passes at him." Richter's Depo. at pp. 83–84. He explained that the girls wrote AY notes and made "googly eyes" at him. *Id.* He further stated that there was some indication that inappropriate touching was taking place. *Id.* He explained that note writing and "googly eyes" are inappropriate for special education students because they cannot recognize the appropriate boundaries. *Id.*

Richter noted that while it was unclear which student on the bus was the protagonist, "it was very clear that there were

issues." *Id.* at p. 83. He indicated that arrangements had been made to send KW and AY on different buses, and to remove plaintiff to a different placement on the bus, "not because of the [KW event] complaint but because of other issues that had already taken place." *Id.* Tucker also testified that she recalled that the District made different seating arrangements for AY and KW because "there had been something that went on on the bus." Tucker Depo. at p. 103.

Following the police and District investigation into the KW event allegations, the District, on approximately December 7, 2004, received a copy of a Determination Order issued by the State of Oregon's Crime Victims' Compensation Fund, finding that KW was entitled to compensation for medical and counseling costs as a result of an October 11, 2004 "criminal injury." Pltf's Exh. 23. The Order recites a conclusion that based on the review of evidence in the case, KW was the subject of a compensable crime. *Id.*

At this point, the record, construing all inferences in plaintiff's favor, indicates that (1) the District failed to train its administrators and teachers in the proper handling and investigation of child abuse reports; (2) the District conducted an investigation into the KW event allegations but this investigation did not include an inquiry into the record possessed by the District which noted that AY had been "sexually curious" in the past; (3) the District was on notice that the police thought it was possible that KW's allegations had merit; (4) the District was on notice that the police thought the District's supervision may be inadequate; (5) the District knew that something had occurred the prior year on the bus between at least AY and KW and it had involved inappropriate touching; (6) the school psychologist noted that in an unstructured setting, the likeli-

hood of sexual advances by AY with his girlfriend, was a "3" or a "4" on a low to high scale of 1 to 6; (7) the school psychologist further stated that AY was likely to engage in flirtatious or sexual behavior with girls he finds attractive and when he has less supervision; (8) the school psychologist stated that AY could benefit from instruction on the difference between a friend and a girlfriend, and the difference between appropriate sexual behavior for his age and development and inappropriate sexual behavior; and (9) the State of Oregon had determined that KW was the victim of a compensable crime.

Against this backdrop, it is undisputed that the District adopted a "line of sight" supervision and escort plan for AY while he was on school property, instructed AY on appropriate sexual behavior and boundaries, completed a functional behavior assessment of AY and plaintiff, and kept AY and plaintiff separated while they were both in Tucker's class. Whether the District also adopted a transportation plan requiring that AY and plaintiff be separated on *all* buses for all classes and trips is disputed. Accordingly, on summary judgment, I must assume that the District did not do so.

I recognize that circuit court cases, echoing *Davis,* caution district courts against holding school districts to a negligence standard in a Title IX claim. *E.g., Fitzgerald v. Barnstable Sch. Comm.,* 504 F.3d 165 (1st Cir.2007) (noting that Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or adopt strategies advocated by parents; further noting that courts are not to second-guess an educational institution's choices "from within a universe of plausible investigative procedures"; and quoting from an earlier First Circuit case, *Porto v. Town of Tewksbury,* 488 F.3d 67, 73 (1st Cir.2007), that " 'a claim that the school

system could or should have done more is insufficient to establish deliberate indifference.' "), *overruled on other grounds,* —— U.S. ——, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009).

Admittedly, this is a close case. However, I cannot conclude that the evidence is such that whether defendants were deliberately indifferent would not be subject to debate amongst reasonable jurors. With the knowledge possessed by the District, the evidence raises questions about the District's investigation into the KW event and the reliability of its conclusion that the allegations were unfounded. This in turn raises legitimate questions about the District's response and knowing what it did, whether its response allowed a high degree of risk that AY would act out against plaintiff.

## 2. Educational Opportunity

█ Defendants argue that regardless of whether plaintiff was the victim of harassment, the evidence shows that she has not suffered a concrete, negative effect on her ability to participate in her education. Defendants contend that neither plaintiff's grades nor her progress reports have declined at any time since the date of the alleged incident. They further contend that her IEP reports indicate continued improvement and that all of her teachers state that she has remained an energetic and enthusiastic student before, during, and after the present incident.

Defendants note that plaintiff continued in the District through her high school graduation in June 2005, and has successfully moved into the District's community transition program offered for adult students with developmental disabilities. Thus, defendants argue, plaintiff has received every benefit that the District has to offer.

The problem with defendants' argument is that the record created by defendants on

summary judgment fails to establish defendants' assertions. The only evidence defendants cite to and submit in support of their assertions regarding plaintiff's receipt of, and performance in, educational opportunities available to her, are plaintiff's 2004, 2005, 2006, 2007, and 2008 IEPs.[5] Defts' Exh. 38.

Defendants fail to direct the Court to any particular pages or sections of pages in the thirty-eight pages of IEP reports. This makes for an unnecessary burden on the Court. Moreover, while the Court has no duty to search for relevant information in a record provided to it, my review of the IEP records reveals no affirmative statements along the lines of defendants' assertion regarding plaintiff's performance. At oral argument, when I questioned defense counsel about the IEP reports and what the Court was supposed to glean from them without any direction from defendants, defense counsel indicated that it was an absence of negative information in the IEPs that was relevant and supportive of defendants' position.

The May 7, 2004 IEP was written before any alleged problems between AY and either KW or plaintiff. Defts' Exh. 30 at pp. 33–38. The May 5, 2005 IEP was written after the alleged incident between KW and AY, and perhaps after the alleged incident between AY and plaintiff on the bus, but before the alleged rape of AY by plaintiff in June 2005. *Id.* at pp. 20–32. These two reports were written when plaintiff was still a student at the high school *Id.* at pp. 20–38. The other reports were all written after the alleged incidents between AY and plaintiff and while plaintiff was at the community transition program. *Id.* at pp. 1–19.

While the inclusion of the 2004 and 2005 reports along with the latter reports, may provide some ability to compare plaintiff's school performance before the alleged AY incidents with her performance thereafter, I note that in June 2005, plaintiff graduated from high school and moved to the new program. Thus, the records, without more, fail to allow for a meaningful comparison of her success in the educational opportunities available to her because the two programs had different goals and expectations.

Also, importantly, without some expert interpretation, the records themselves do not reveal how plaintiff performed vis-a-vis the expectations of her. Some comments indicate she was doing well, but others indicate continued problems. *E.g., Id.* at p. 23 (May 5, 2005 IEP noting that plaintiff can be very pleasant); p. 12 (April 27, 2006 IEP noting that plaintiff can be a hard worker); p. 3 (April 26, 2007 IEP notes parents' concerns that plaintiff is not accessing full range of services provided in the transition program and further noting plaintiff's longstanding history of lying and compulsive stealing as creating restrictions preventing her from accessing work sites outside the classroom).

If plaintiff's performance meets or even exceeds the expectations of her, defendants might be able to establish an absence of evidence supporting plaintiff's claim on the educational opportunity issue. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548 (burden on moving party at summary judgment "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

---

**5.** Although defendants state that five separate reports comprise Exhibit 38, I find only four: Pages 1 through 10 are pages from the April 26, 2007 IEP; pages 11 through 19 are pages from the April 27, 2006 IEP; pages 20 through 32 are pages from the May 5, 2005 IEP; and pages 33 through 38 are pages from the May 7, 2004 IEP. Defts' Exh. 38.

If plaintiff's performance is below the expectations of her, further exploration of the causes for this might be in order. Because, however, the records, by themselves, do not provide this information, defendants' assertions as to the educational opportunity prong of the four-part *Davis* test, are unsupported. Without some explanation of IEPs either by an expert or someone familiar with these particular IEPs, I cannot say that the only reasonable interpretation of these reports is that plaintiff experienced no loss of educational opportunity as a result of the alleged incidents with AY in the spring of 2005. Thus, even without considering the paragraphs of Counts's Declaration that plaintiff cites in support of her position that she did suffer educationally, defendants should not be granted summary judgment on this issue.

I recommend that defendants' summary judgment motion on the Title IX claim be denied as to defendant District.

## II. Section 1983 Claims

Plaintiff brings a section 1983 claim against the District and a separate section 1983 claim against Naso and Miner. Plaintiff contends that the District has a policy, practice, or custom of failing to remove sexually abusive perpetrators from its special needs education program and that as a result of this policy, practice, or custom, the District's policymakers ignored requests to remedy the sexually harassing environment by removing AY from the high school, and by refusing to remedy the sexually harassing environment, the District affirmatively deprived plaintiff of, or acted with deliberate indifference to the risk of deprivation to, her constitutional liberty and property interests in a public education, and her right to the equal protection of the law. Compl. at ¶¶ 23–28.

As to the individual defendants, plaintiff contends that Naso and Miner, knowing that KW had been sexually assaulted by AY, and knowing that plaintiff observed some of that attack, nonetheless failed to remove AY from the high school and thus, Naso and Miner affirmatively deprived plaintiff of, or acted with deliberate indifference to the risk of deprivation to, her constitutional liberty and property interests in public education, and her right to the equal protection of the law. *Id.* at ¶¶ 30–32.

In their motion for summary judgment, defendants argued that (1) there was no deliberate indifference; (2) there was no intentional discrimination based on plaintiff's membership in an identifiable class of persons; (3) the individual defendants were entitled to qualified immunity; and (4) plaintiff's Title IX claim precluded her section 1983 claim because the claims were based on the same facts.

In response to the motion, plaintiff addressed only the last argument raised by defendant—whether the section 1983 claim was precluded. Plaintiff did not address defendants' arguments as to the merits of the section 1983 claims.

On January 21, 2009, the Supreme Court resolved a split among the circuits and held that section 1983 claims are not precluded by the presence of a Title IX claim based on the same facts. *Fitzgerald,* 129 S.Ct. at 796–97. Therefore, I reject defendants' argument to the contrary. Additionally, for the reasons articulated in the discussion of the Title IX claim, I recommend concluding that there are issues of fact regarding defendants' deliberate indifference.

However, as to the rest of defendants' merits arguments, the briefing has been insufficient to properly frame the issues before the Court. Moreover, my own research has raised questions which the parties must address.

Thus, I order the parties to address the following issues in supplemental briefing, as outlined below:

(1) What legal authority is there for plaintiff's claims asserting a substantive liberty or property interest in a public education? *See Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("Public education is not a 'right' granted to individuals by the Constitution."); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution"); *see also Handberry v. Thompson,* 436 F.3d 52, 70 (2d Cir.2006) ("The Fourteenth Amendment does not protect a public education as a substantive fundamental right.").

(2) What factual evidence exists in the record to support the claim that the District maintained a custom, policy, or practice of failing to remove sexually abusive perpetrators from the special education program?

(3) What is the nature of plaintiff's Equal Protection claim? That is, is the claim grounded in alleged discrimination based on disability, gender, both, or some other characteristic?

(4) If the nature of the Equal Protection claim is alleged discrimination based on disability, how does plaintiff address the law providing that the mentally disabled are not a suspect or quasi-suspect class for purposes of equal protection claims. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *see also Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (stating that "the result of *Cleburne* is that States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so

long as their actions toward such individuals are rational.").

(5) What factual evidence exists in the record to support the claim that defendants' actions were motivated by bias against the disabled or against women?

(6) Does *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), which receded from *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), affect defendants' qualified immunity argument, and what is plaintiff's response to that argument?

The parties' supplemental memoranda must address these questions, at a minimum. Defendants' supplemental memorandum is due two weeks from the date of this Findings & Recommendation. Plaintiff's response is due two weeks thereafter. Defendants' reply is due two weeks following the filing of plaintiff's response. No oral argument will be scheduled.

Upon receipt of the supplemental briefing, the Court will issue a Supplemental Findings & Recommendation. The Findings & Recommendation issued this date, will be referred to an Article III District Court Judge for review together with the Supplemental Findings & Recommendation. Thus, the Findings & Recommendation issued this date contains no date for objections because objections will taken for this Findings & Recommendation and the forthcoming Supplemental Findings & Recommendation together, only after the filing of the Supplemental Findings & Recommendation.

### III. Motion to Strike

I deny defendants' motion to strike as moot. The only paragraphs of Counts's Declaration I considered in resolving the summary judgment motion were paragraphs six, seven, and nine. Because they did not support the facts asserted by plain-

tiff, I did not rely on them. I also did not rely on or consider other paragraphs regarding plaintiff's alleged decompensation at home and in school following the alleged incident between AY and KW, and following the alleged incidents between AY and plaintiff, because defendants' evidence on the educational opportunity issue was ambiguous and failed to show that plaintiff could not prevail on that issue.

## CONCLUSION

I recommend that defendants' motion for summary judgment (# 24) be granted as to the individual defendants on the Title IX claim, and be denied as to defendant District on the Title IX claim. I defer ruling on the section 1983 claims. I deny as moot the motion to strike (# 37).

IT IS SO ORDERED.

## SUPPLEMENTAL FINDINGS
## & RECOMMENDATION

This case involves claims by plaintiff GC, an incapacitated minor who is represented through her duly appointed conservator Kenneth Counts, against defendants North Clackamas School District ("the District"), District Superintendent Ron Naso, Principal Jan Miner, and special education teacher Angela Tucker.

Plaintiff generally contends that following an alleged sexual assault or rape by a male developmentally disabled student against a female developmentally disabled student in the fall of 2004, the District failed to take adequate measures to prevent an alleged subsequent assault or assaults by the same male developmentally disabled student against plaintiff in the spring of 2005. Plaintiff brings a claim of negligence against the District, a claim under Title IX against the District and all three individual defendants, and claims under 42 U.S.C. § 1983 against the District, Naso, and Miner.

Defendants moved for summary judgment on the Tile IX and section 1983 claims. In a February 5, 2009 Findings & Recommendation (dkt. # 49), I recommended that defendants' motion be granted as to the individual defendants on the Title IX claim and denied as to defendant District on the Title IX claim. I deferred ruling on the section 1983 claims because of insufficient briefing on the merits of those claims.

At my direction, the parties filed supplemental briefing on the section 1983 claims, specifically addressing six questions posed to the parties in the February 5, 2009 Findings & Recommendation. For the reasons explained below, I recommend that defendants' summary judgment motion as to the section 1983 claims be granted. The facts of the case are thoroughly detailed in the February 5, 2009 Findings & Recommendation and I do not repeat them here.

Plaintiff brings two section 1983 claims, one against the District and the other against Naso and Miner. Plaintiff contends that the District has a policy, practice, or custom of failing to remove sexually abusive perpetrators from its special needs education program and that as a result of this policy, practice, or custom, the District's policymakers ignored requests to remedy the sexually harassing environment by removing AY from the high school, and by refusing to remedy the sexually harassing environment, the District affirmatively deprived plaintiff of, or acted with deliberate indifference to the risk of deprivation to, her constitutional liberty and property interests in a public education, and her right to the equal protection of the law. Compl. at ¶¶ 23–28.

Plaintiff contends that Naso and Miner, knowing that KW had been sexually assaulted by AY in the fall of 2004, and knowing that plaintiff observed some of

that attack, nonetheless failed to remove AY from the high school and thus, Naso and Miner affirmatively deprived plaintiff of, or acted with deliberate indifference to the risk of deprivation to, her constitutional liberty and property interests in public education, and her right to the equal protection of the law. *Id.* at ¶¶ 30–32.

In response to my question in the February 5, 2009 Findings & Recommendation regarding what legal authority exists for plaintiff's claims asserting a substantive liberty or property interest in a public education, Feb. 5, 2009 F & R at p. 1244, plaintiff cites no authority supporting that claim. Instead, plaintiff asserts that her claim is one for substantive due process based on her constitutional right to bodily integrity. Based on the cases cited in the February 5, 2009 Findings & Recommendation on this issue, I recommend that defendants' motion as to plaintiff's section 1983 claims against the District, Naso, and Miner, be granted to the extent the section 1983 claims are based on plaintiff's theory of a constitutional interest in a public education.

## I. Due Process Claim—Bodily Integrity

■ The Ninth Circuit recognizes a public school student's "constitutional right to be free from state-imposed violations of bodily integrity." *Plumeau v. Yamhill County Sch. Dist. # 40*, 130 F.3d 432, 438 (9th Cir.1997) ("a student's liberty interest in bodily integrity logically encompasses" "the right to be free from sexual abuse by school employees"). I find no Ninth Circuit cases, and plaintiff cites none, where the court has recognized a substantive due process claim based on a violation of the right to bodily integrity in a peer-to-peer harassment context. Magistrate Judge Stewart recently noted the lack of such Ninth Circuit authority. *Morgan v. Bend–La Pine Sch. Dist.*, No. CV–07–173–ST, 2009 WL 312423, at *10 (D.Or. Feb. 6, 2009) ("No Ninth Circuit case has allowed

a substantive due process claim premised on a violation of the right to bodily integrity arising out of the failure of teachers or a school district to detect and prevent student-to-student sexual harassment in a public school.").

■ However, like Judge Stewart did in *Morgan*, I assume the Ninth Circuit would recognize the right. Nonetheless, I recommend that summary judgment be granted to defendants on plaintiff's newly asserted "bodily integrity" substantive due process claim.

While plaintiff may have changed the constitutional right upon which she asserts her due process claim, it appears that the basis of the claim is still a failure by the District to protect her from AY. *See* Pltf's Am. Resp. Mem. on Section 1983 Claims at p. 3 ("Plaintiff has alleged that [ ] defendants failed to protect her from the sexual abuse inflicted on her in the Spring of 2005 and the rape in June 2005."). Additionally, she articulates for the first time in her supplemental memorandum on the section 1983 claims, that defendants violated her substantive due process rights by their failure to train employees regarding student sex abusers.

■ As originally articulated in her Complaint, plaintiff's primary argument, regardless of whether the right at issue is a liberty or property right in public education, or a substantive due process right to bodily integrity, is that the District has a policy, practice, or custom of failing to remove sexually abusive perpetrators from its special needs education program. Before addressing the lack of evidence in the record on this issue, I note that generally, "a state is not liable for failing to protect individuals from harm by third parties[.]" *Morgan*, 2009 WL 312423, at *10 (citing, *inter alia*, *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).

However, there are two recognized exceptions to this rule. *Id.*

The "special relationship" exception applies where a state actor abuses a special state-created relationship with an individual, such as in the case of custody or involuntary hospitalization. *Morgan v. Gonzales*, 495 F.3d 1084, 1093–94 (9th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1290, 170 L.Ed.2d 71 (2008); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). The second exception is the "danger creation exception," under which "state actors may be held liable where they affirmatively place an individual in danger by acting with deliberate indifference to a known or obvious danger in subjecting plaintiff to it." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) ("*Ridgefield*"), *denying pet. for rehr'g en banc,* 440 F.3d 1091 (2006) (Internal citations quotations and brackets omitted); *see also Huffman v. County of Los Angeles*, 147 F.3d 1054, 1059 (9th Cir.1998), *cert. denied,* 526 U.S. 1038, 119 S.Ct. 1333, 143 L.Ed.2d 498 (1999). The second exception applies where the state creates a "danger that the plaintiff would not have otherwise faced, as when the police reveal an accuser's name after assuring her that she would be warned before any further action was taken." *Shanks v. Dressel*, 540 F.3d 1082, 1088 n. 5 (9th Cir.2008) citing *Ridgefield*, 439 F.3d at 1061.

*Morgan,* 2009 WL 312423, at *10.

Plaintiff fails to identify which of the two exceptions she contends applies in this case. However, another district court within the Ninth Circuit has determined, under similar facts, that the "special relationship" exception does not apply here. *Schroeder v. San Diego Unified Sch. Dist.,* No. 07cv1266–IEG(RBB), 2007 WL 4225449, at *4 (S.D.Cal. Nov. 26, 2007) (with no allegation that defendants required the developmentally disabled plaintiff to attend the school at which she was allegedly sexually harassed and assaulted by a peer, no allegation that defendants took custody of the plaintiff to the exclusion of her mother's parental rights, and no allegation that defendants restricted the plaintiff's personal liberty in a manner similar to incarceration or institutionalization, plaintiff failed to allege a special relationship supporting the imposition of liability under the Due Process Clause).

 Under the "danger creation exception," plaintiff must prove that the "defendant effectively prevented the plaintiff from protecting [her]self or prevented access to outside sources of help." *Morgan,* 2009 WL 312423, at *11. "The defendant must affirmatively place an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* (internal quotation and brackets omitted). Plaintiff must show that "state action create[d] or expose[d][her] to a danger which [she] would not have otherwise faced." *Johnson v. City of Seattle,* 474 F.3d 634, 639 (9th Cir.2007) (internal quotation omitted). She must also allege that the danger to which defendants allegedly exposed her was "known or obvious" and that defendants "acted with deliberate indifference to it." *Ridgefield,* 439 F.3d at 1064.

While plaintiff's section 1983 substantive due process claim is generally described as a failure to protect plaintiff from harm by AY, plaintiff specifically contends first, that defendants fail to remove sexually abusive perpetrators from special education classrooms, and that defendants fail to train employees in "dealing with sex abuse issues." Plaintiff does not articulate how a failure to act to remove allegedly abusive students or how a failure to train

can satisfy the affirmative act required in a "danger creation exception" case.

In a similar case, the parents of an autistic student brought claims under Title IX and the Fourteenth Amendment when their daughter, a special education student, was allegedly sexually assaulted on the school bus. *Staehling v. Metropolitan Gov't of Nashville & Davidson County*, No. 3:07–0797, 2008 WL 4279839 (M.D.Tenn. Sept. 12, 2008). Citing *DeShaney*, the *Staehling* court noted the "general proposition" that "governmental entities are not liable for injuries sustained by private citizens as a result of the citizen's own or another private citizen's conduct." *Id.* at *5. The court discussed the two exceptions, and explained the requirements for the state-created danger exception. *Id.* at *5–6.

The first requirement, similar to what the Ninth Circuit has articulated, includes an affirmative act by the state, which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party. *Id.* at *6. The court held that the plaintiff failed to satisfy the requirement. *Id.* at *7. The court explained that the

> [p]laintiffs fail to point to an affirmative act which created or increased the risk of harm to Plaintiff. Instead, they point to alleged failures of Defendant, such as placing special needs students together on a bus without monitors, failing to sufficiently train bus drivers and the bus driver failing to adequately monitor what was going on behind her. These allegations do not meet the criteria for the state-created danger exception to *DeShaney.*

*Id.* at *7. The court concluded its discussion of the plaintiff's substantive due process claim by remarking that "the situation presented is regrettable." *Id.* at *8. Frankly, although events such as those alleged in this case are beyond regrettable,

the issue is whether they are actionable. The *Staehling* court explained that

> [p]laintiffs have pointed to nothing which suggests that any affirmative act of the school led to the assault. Instead, it arose as a result of another child's actions. While Plaintiffs point to what may be characterized as derelictions on the part of the school, as was the case in *DeShaney*, the most that can be said of Metro is that they stood by and did nothing even though prudence may have dictated that they do more.

*Id.*

The instant case is indistinguishable from *Staehling.* Here, plaintiff alleges that defendants' failure to implement certain consequences for AY's bad acts and failure to train created the failure to protect her from sexual assault. As in *Staehling*, plaintiff here fails to point to an affirmative act by the District which led to the alleged assaults by AY. Plaintiff's substantive due process claim should be dismissed for this reason alone.

Even if it could be argued that defendants affirmatively placed plaintiff in a position of danger by failing to train and failing to implement consequences for AY's bad acts, plaintiff's claim still fails. Plaintiff fails to establish a question of fact as to the District's alleged policy, practice, or custom of failing to remove sexually abusive perpetrators from the special education program. The only evidence in the record concerns AY, a single student. Plaintiff presents no evidence of any other alleged sexually abusive perpetrator that the District failed to remove. There is no official policy. And, a single incident is insufficient to establish a longstanding practice or custom. *E.g., Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir.1999) (single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom); *Trevino v. Gates*, 99 F.3d

911, 918 (9th Cir.1996) (liability "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of insufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). Moreover, while the single act of a final policymaker may establish municipal policy for the purposes of a section 1983 claim, *Lassiter v. City of Bremerton,* 556 F.3d 1049, 1055 (9th Cir.2009), as discussed below, Naso and Miner are not final policymakers for the district for the claims raised by plaintiff here.

As for the training claim, plaintiff contends that the District was on notice, beginning in 2001, that "it had a problem in dealing with sex abuse issues." Pltf's Am. Resp. Mem. on Section 1983 Claims at p. 5. Plaintiff suggests that as a result of this notice, the District knew that its failure to train its employees regarding sexually abusive students created a known risk to plaintiff's constitutional rights. As support, plaintiff cites to a 2001 letter from the District's Risk Manager Gary Richter to the Great American Insurance Company. Pltf's Exh. 4.

This letter does not support plaintiff's assertion that there was a generalized District problem in "dealing with sex abuse issues." The letter confirmed the insurance company's request that the District clarify what actions have been taken "since this event." *Id.* It refers to "this occurrence and related police investigation," and notes that at the time, the District determined that "there were numerous problems and potential problems in the way in which a matter like this could be handled." *Id.* The letter reveals no other information about the "event" or the "occurrence."

Richter explained that the District was currently in the process of reviewing its "activities regarding any forms of, or reports on child abuse." *Id.* He noted that a training program for administrators and

key school personnel was being developed. *Id.* The letter indicates that the specific problem concerned handling of complaints and child abuse reports. The letter does not show that the "occurrence" was a peer-to-peer sexual harassment or assault incident and does not show any kind of notice to the District of a recurring problem with peer-to-peer conduct. The letter is too general and not clearly related to sex abuse as opposed to the broader issue of child abuse.

In a 2009 case, the Eighth Circuit explained that to survive a summary judgment motion by a defendant school district on a claim that it failed to receive, investigate, and act upon complaints of unconstitutional conduct, or that it failed to train its employees to prevent or terminate unconstitutional conduct, the plaintiff must present evidence that "(1) there was a continuing, widespread, persistent pattern of unconstitutional misconduct, (2) the school's policymaking officials were deliberately indifferent to or tacitly authorized such conduct after gaining knowledge of such conduct, and (3) [the plaintiff] was injured by acts pursuant to the school's custom." *Plamp v. Mitchell Sch. Dist. No. 17–2,* 565 F.3d 450, 459 (8th Cir.2009) (internal quotations omitted).

Here, plaintiff fails to cite to any evidence that there was a continuing, widespread, persistent pattern of unconstitutional misconduct. As noted above, plaintiff presents no evidence of peer-to-peer incidents, or even allegations, concerning any student other than AY. Plaintiff presents no evidence that the District's alleged unconstitutional conduct of failing to protect a student was widespread. Plaintiff presents no evidence that the District had a custom or practice of ignoring reports about problems "in the District's treatment of sex abuse issues leading to a lack of protection of

the students[.]" Pltf's Am. Resp. Mem. on Section 1983 Claims at p. 7. The only evidence plaintiff presents is the alleged failure by the District to properly respond to the KW incident by failing to more strenuously discipline AY. This is not evidence of a continuing, widespread, persistent pattern.

■ Plaintiff further fails to show that the 2001 letter to the insurer put the District on notice that it had a peer-on-peer sexual harassment or assault problem that it was failing to address. Additionally, while plaintiff argues that Superintendent Naso was a final policymaker for the District in regard to its training of employees and in regard to actions taken in response to student misconduct, plaintiff cites no evidence or law to support this position.

Whether a particular individual has final policymaking authority for purposes of municipal liability in a section 1983 claim, is a legal question dependent upon state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Under Oregon Revised Statute § (O.R.S.) 332.072, a "district school board is authorized to transact all business coming within the jurisdiction of the district .... [;] district school boards have control of the district schools and are responsible for educating children residing in the district." Under O.R.S. 339.240(2), the district school board is required to "adopt and attempt to give the widest possible distribution of copies of reasonable written rules regarding pupil conduct, discipline and rights and procedures pertaining thereto." The district school board is also required to enforce consistently and fairly its written rules regarding pupil conduct, discipline and rights. O.R.S. 339.240(3).[1]

The district school board is expressly charged with developing policies on managing students who threaten violence or harm in public schools. O.R.S. 339.250(4)(b). And, under Oregon law, the district school board is expressly charged with adopting policies on the reporting of child abuse. O.R.S. 339.372.

While there is no statute that expressly states that the final policymaker for a school district under Oregon law is the school board, the statutes cited above show that for the claim raised by plaintiff in this case, the school board, not the superintendent or school principal, is the final policymaker. *See also Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 381–82 (5th Cir.) (where state law gives school board the authority to make policy, and the superintendent the authority to administer, the school board, not the superintendent, is the final policymaker), *cert. denied*, 552 U.S. 888, 128 S.Ct. 255, 169 L.Ed.2d 148 (2007); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468–69 (7th Cir.2001) (school superintendent and principal were not final policymakers for school district under Wisconsin law); *Plumeau v. Sch. Dist. No. #40, County of Yamhill*, 907 F.Supp. 1423, 1442 (D.Or. 1995) (school principal had no authority to set district policies on any subject), *aff'd*, 130 F.3d 432.

I recommend that summary judgment be granted to the District on plaintiff's substantive due process "bodily integrity" claim.

As to Naso and Miner, plaintiff's claim is that with knowledge that AY sexually assaulted KW, and with knowledge that plaintiff observed some of that attack, Naso's and Miner's failure to remove AY from the school constituted deliberate in-

---

1. Although O.R.S. 339.240(3) states that it does not apply to a pupil who is eligible for special education, plaintiff makes no argument that her status as a special education student, or AY's status as such, impacts the determination of who, under state law, is a final policymaker for purposes of her substantive due process section 1983 claim.

difference to the risk of deprivation to plaintiff's right to bodily integrity. Just as with the claim against the District, plaintiff's "failure to act" claim cannot be brought under the "danger-creation exception" to *DeShaney* which requires some kind of affirmative act.

■ Alternatively, plaintiff fails to show that these particular individuals were responsible for the decision to retain AY in the school. The record establishes that school psychologist Panko met with AY's foster parent and caseworker and discussed moving him to another school. Panko Tr. 24–25. Panko states that more corroborating evidence of the KW incident was required before AY could be moved to a more restrictive environment, consistent with special education requirements. Plaintiff points to no evidence in the record indicating that either Miner or Naso was involved in the decision to allow AY to stay in the same school as plaintiff, either by participating in the decision or directing it. Because they cannot be held liable in a section 1983 action based on a respondeat superior theory of liability, summary judgment should be granted to Naso and Miner on plaintiff's substantive due process claim. *E.g., Humphries v. County of Los Angeles*, 554 F.3d 1170, 1202 (9th Cir. 2009) (under section 1983, supervisor liable only for his own acts by participating in or directing the alleged violations).

## II. Equal Protection Claim

■ As originally pleaded in her Complaint, the basis for plaintiff's equal protection claim was unclear. In the February 5, 2009 Findings & Recommendation, I asked plaintiff to clarify the basis for the claim and to identify whether it was based on gender, disability, or some other characteristic. In her supplemental response memorandum, plaintiff identifies the claim as based on gender. Pltf's Am. Resp. Mem. on Section 1983 Claims at p. 20.

Plaintiff argues that defendants' failures to act were motivated by a bias against women, as evidenced by the fact that they allowed the sexual abuse and rape of plaintiff to occur, and by the fact that they did not believe KW and plaintiff were telling the truth, but always believed AY. The record does not support plaintiff's assertions.

To state a section 1983 claim for violation of the Equal Protection Clause, plaintiff must show that defendants acted with an intent or purpose to discriminate against her based on her membership in a protected class. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir.2001). Gender is a protected class. *Oona R.-S. by Kate S. v. McCaffrey*, 143 F.3d 473, 476 (9th Cir.1998) ("The Equal Protection Clause creates the right to be free from any purposeful sex discrimination by state actors.").

Plaintiff must also show that she was treated differently from similarly situated students. *E.g., Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir.2000) (equal protection violation occurs when the government treats someone differently from another who is similarly situated). In this case, that means showing that defendants treated plaintiff differently from similarly situated male students. *See Rohren v. Centennial Pub. Sch. Dist. 67–R*, No. 4:07CV3150, 2008 WL 939177, at *4 (D.Neb. Apr. 4, 2008) (in gender-based equal protection claim, plaintiff needed to show she was treated differently than similarly situated males); *Malcom v. Seipel*, No. 05–3238, 2008 WL 818342, at *15 (C.D.Ill. Mar. 20, 2008) (to sustain equal protection claim based on gender, plaintiff required to identify evidence of similarly situated males who were treated more favorably).

As with her substantive due process claim against the District, to sustain her

equal protection claim against the District, plaintiff must show that a District employee was acting pursuant to an expressly adopted official policy, that the employee was acting pursuant to a longstanding practice or custom, or that the employee was a final policymaker. *E.g., Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir.2004); *see also Fitzgerald v. Barnstable Sch. Committee*, —— U.S. ——, 129 S.Ct. 788, 797, 172 L.Ed.2d 582 (2009) (a section 1983 plaintiff alleging a violation of the Equal Protection Clause by a school district must show that the harassment was the result of district policy, custom, or practice).

Plaintiff proffers no evidence of an express policy of gender discrimination in the handling of peer-to-peer sexual harassment or abuse. Plaintiff proffers no evidence of a longstanding District custom or practice of gender discrimination in the handling of peer-to-peer sexual harassment or abuse. And, plaintiff, for the reasons above, fails to show that Naso or Miner is a final policymaker. I recommend that summary judgment be granted to the District on plaintiff's equal protection claim.

The only evidence plaintiff offers in support of her argument that Naso and Miner violated her equal protection rights by treating her differently than similarly situated males, is to state that Naso and Miner did not believe plaintiff or KW, who are both girls, but believed a male victim of sexual abuse by AY. Pltf's Am. Resp. Mem. on Section 1983 Claims at p. 20. Plaintiff cites to no specific exhibit in support, but my review of the record suggests plaintiff relies on Defendants' Exhibit 36, a February 8, 2006 letter from Panko to Clackamas County Circuit Judge Deanne L. Darling. There, Panko requests permission from Judge Darling to move AY to a different school district based on the history of "serious allegations" made against AY the prior year while at Clackamas High School, and based on the fact that AY was now living in a group home in a new school district after having been "removed from his foster home recently due to some concerns about sexual behavior with a younger child living in the home." Defts' Exh. 36.

This letter does not indicate the gender of the "younger child." The letter does not provide any more information about the nature of the "sexual behavior." Notably, the "younger child" was not a student at the high school and thus, was not similarly situated to plaintiff. Also notably, the letter does not support that Naso or Miner formed any belief whatsoever about what occurred between AY and this "younger child." The letter requests only that Judge Darling approve a change to AY's school placement now that AY was in a different school district and because of AY's prior "serious allegations" against him. Plaintiff fails to create an issue of fact that Naso or Miner treated female victims of alleged sexual abuse by AY any differently than male victims. Finally, the mere fact that plaintiff, a female, was allegedly assaulted and then allegedly raped by AY, a male, after the alleged incident with KW, does not, by itself, establish that Naso and Miner acted, or failed to act, with the purposeful intent of discriminating against women. I recommend that summary judgment be Naso and Miner on plaintiff's equal protection claim as to Naso and Miner.

Finally, because I recommend granting summary judgment to defendants on the merits of the section 1983 claims, I do not consider defendants' qualified immunity argument.

## CONCLUSION

I recommend that defendants' motion for summary judgment (# 24) be granted as to the section 1983 claims.

## SCHEDULING ORDER

The above Supplemental Findings and Recommendation, along with the February 5, 2009 Findings & Recommendation, will be referred to a United States District Judge for review. Objections, if any, are due July 10, 2009. If no objections are filed, review of the February 5, 2009 Findings and Recommendation, and the Supplemental Findings & Recommendation, will go under advisement on that date.

If objections are filed, a response to the objections is due July 24, 2009, and the review of the February 5, 2009 Findings and Recommendation, and the Supplemental Findings & Recommendation, will go under advisement on that date.

IT IS SO ORDERED.